800 A.2d 73

JOSEPH HOWARD AND MARIE HOWARD, PLAINTIFFS–RESPONDENTS, v. UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, DR. C. RUEBENACKER, DR. C. VAICYS, DR. GRIGORIAN, M. FELIX, KRISTIN SCHWERZER, J. ESPOSITO, E. WHEELER, JONATHAN DALMER, JOHN DOES 1–25 (FICTITIOUS NAMES), JANE DOES 1–25 (FICTITIOUS NAMES), JIM DOES 1–25 (FICTITIOUS NAMES), BETTY DOES 1–25 (FICTITIOUS NAMES), AND ABC CORPS., 1–20 (FICTITIOUS NAMES), DEFENDANTS, AND DR. ROBERT HEARY AND KAREN ROMANO, DEFENDANTS–APPELLANTS.

Argued January 2, 2002—Decided June 18, 2002.

R. *Scott Eichhorn* argued the cause for appellants (*McDonough, Korn & Eichhorn,* attorneys; *Matthew S. Schorr,* of counsel; *Mr. Schorr* and *William S. Mezzomo,* on the briefs).

*Bruce H. Nagel* argued the cause for respondents (*Nagel Rice Dreifuss & Mazie,* attorneys; *Mr. Nagel, Robert H. Solomon* and *Adam M. Slater,* of counsel; *Mr. Nagel, Mr. Solomon* and *Mr. Slater,* on the briefs).

*Joel M. Silverstein* submitted a brief on behalf of amicus curiae *Medical Society of New Jersey* (*Stern, Greenberg & Kilcullen,* attorneys).

*Kevin McNulty* submitted a brief on behalf of amicus curiae *University Physician Associates of New Jersey, Inc.* (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys).

The opinion of the Court was delivered by

LaVECCHIA, J.

In this appeal we consider what causes of action will lie when a plaintiff contends that a physician misrepresented his credentials and experience at the time he obtained the plaintiff's consent to surgery.

I.

Plaintiff, Joseph Howard, came under the care of defendant, Dr. Robert Heary, in February 1997 for neck pain and related complaints. He had a history of cervical spine disease. Following a car accident in 1991, he was diagnosed with spondyliosis, with spinal cord compression extending from the C3 to C7 cervical discs. According to various doctors who examined him at that time he had severe cervical spinal stenosis, and he was advised to undergo a "decompressive cervical laminectomy because of the

extent of his cervical pathology." Although the condition was "worsening progressively," plaintiff decided to forego surgery.

In January 1997, another automobile accident caused plaintiff injuries that included a cerebral concussion, cervical syndrome with bilateral radiculopathies, and low back syndrome with bilateral radiculopathies. Plaintiff sought the care of Dr. Boston Martin, who had treated him after the 1991 accident. Dr. Martin concluded that plaintiff's spinal condition had worsened significantly and recommended that plaintiff be seen at the University of Medicine and Dentistry of New Jersey (UMDNJ) by Dr. Heary, a Professor of Neurosurgery and the Director of UMDNJ's Spine Center of New Jersey.

Dr. Heary had two pre-operative consultations with plaintiff. In the first consultation, Dr. Heary determined that plaintiff needed surgery to correct a cervical myelopathy secondary to cervical stenosis and a significantly large C3 C4 disc herniation. Because of the serious nature of the surgery, Dr. Heary recommended that plaintiff's wife attend a second consultation. The doctor wanted to explain again the risks, benefits, and alternatives to surgery, and to answer any questions concerning the procedure.

Plaintiff returned with his wife for a second consultation, but what transpired is disputed. An "Office Note" written by Dr. Heary detailing the contents of the consultation states that "[a]ll alternatives have been discussed and patient elects at this time to undergo the surgical procedure, which has been scheduled for March 5, 1997." Dr. Heary asserts that he informed plaintiff and his wife that the surgery entailed significant risks, including the possibility of paralysis. Plaintiffs dispute that they were informed of such risks. Further, they contend that during the consultation plaintiff's wife asked Dr. Heary whether he was Board Certified and that he said he was. Plaintiffs also claim that Dr. Heary told them that he had performed approximately sixty corpectomies in each of the eleven years he had been performing such surgical procedures. According to Mrs. Howard, she was opposed to the surgery and it was only after Dr. Heary's specific claims of skill

and experience that she and her husband decided to go ahead with the procedure.

Dr. Heary denies that he represented that he was Board Certified in Neurosurgery.[1] He also denies that he ever claimed to have performed sixty corpectomies per year for the eleven years he had practiced neurosurgery.

Dr. Heary performed the surgical procedure on March 5, 1997, but it was unsuccessful. A malpractice action was filed alleging that Mr. Howard was rendered quadriplegic as a result of Dr. Heary's negligence.

During pretrial discovery, Dr. Heary and Mr. and Mrs. Howard were deposed. Plaintiffs claim that they learned from Dr. Heary's deposition that he had misrepresented his credentials and experience during the pre-surgery consultation. In his deposition Dr. Heary stated that he was not Board Certified at the time of the surgery, and that he had performed approximately "a couple dozen" corpectomies during his career. Based on that allegedly new information, plaintiffs moved unsuccessfully to amend their original complaint to add a fraud count.

In denying the motion, the trial court reasoned that "the plaintiff can get before the jury everything that is necessary without clouding the issue [with] is there a fraud here against the doctor. . . . I have to agree with counsel for defendant that that, in essence, is not the nexus of malpractice." The court added that the fraud count would be duplicative, because if it were true that the doctor had misrepresented his credentials and experience plaintiffs still would be required to prove that Dr. Heary deviated from the acceptable standard of care to be entitled to recovery.

---

[1] Although he was Board Eligible at the time of Mr. Howard's surgery, Dr. Heary did not become Board Certified in Neurosurgery until November 1999. "A physician is considered to be a surgical specialist if the physician: (1) Is certified by an American surgical specialty board approved by the American Board of Medical Specialties; or (2) Has been judged eligible by such a board for its examination by reason of education, training and experience." *American College of Surgeons Statements on Principles,* Section II.A.

On leave to appeal the interlocutory order, the Appellate Division reversed and remanded with direction to the trial court to permit amendment of the complaint to include a "deceit based claim." *Howard v. University of Medicine and Dentistry*, 338 *N.J.Super.* 33, 39, 768 *A.*2d 195 (2001). Rejecting the contention that the amended complaint caused undue prejudice to defendant, the Appellate Division held that the denial of the motion for leave to amend did not comport with the interests-of-justice standard. *Id.* at 38, 768 *A.*2d 195. In respect of the merits of the newly pled claim based on deceit, the panel disagreed that plaintiff would be required to prove negligent performance of the surgery in order to recover damages. *Ibid.* The Appellate Division likened the claim for fraudulent misrepresentation to a claim for battery, when a doctor, other than the one authorized under principles of informed consent, performs the surgery. *Id.* at 39, 768 *A.*2d 195. In such circumstances, proof of negligent performance by the doctor would not be required. *Ibid.*

We granted defendant's motion for leave to appeal, 168 *N.J.* 287, 773 *A.*2d 1152 (2001).

## II.

Presently, a patient has several avenues of relief against a doctor: (1) deviation from the standard of care (medical malpractice); (2) lack of informed consent; and (3) battery. *Colucci v. Oppenheim*, 326 *N.J.Super.* 166, 180, 740 *A.*2d 1101 (App.Div. 1999), *certif. denied*, 163 *N.J.* 395, 749 *A.*2d 369 (2000) (citations omitted). Although each cause of action is based on different theoretical underpinnings, "it is now clear that deviation from the standard of care and failure to obtain informed consent are simply sub-groups of a broad claim of medical negligence." *Teilhaber v. Greene*, 320 *N.J.Super.* 453, 463, 727 *A.*2d 518 (App.Div.1999) (citations omitted). The original complaint in this case alleged a standard medical malpractice claim of deviation from the standard of care. Plaintiffs' motion to amend the complaint to add a fraud claim raises the question whether a patient's consent to surgery

obtained through alleged misrepresentations about the physician's professional experience and credentials is properly addressed in a claim of lack of informed consent, or battery, or whether it should constitute a separate and distinct claim based on fraud.

## A.

We focus first on the distinction between lack of informed consent and battery as they are recognized in New Jersey. The doctrine of informed consent was tied initially to the tort of battery, but its evolution has firmly established it as a negligence concept. See *Largey v. Rothman*, 110 *N.J.* 204, 207–08, 540 *A.*2d 504 (1988) (tracing history of theory of informed consent). Early cases recognized a cause of action for an "unauthorized touching" or "battery" if a physician did not obtain consent to perform a medical procedure. *See, e.g., Mohr v. Williams,* 95 *Minn.* 261, 104 *N.W.* 12, 14–15 (1905) (finding physician liable for operating on left ear when permission given only for surgery on right ear); *Schloendorff v. Society of New York Hosp.,* 211 *N.Y.* 125, 105 *N.E.* 92, 93 (1914) (citations omitted) (declaring importance of personal autonomy in medical setting: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages."). Because doctors ordinarily lacked the "intent" to harm normally associated with the tort of battery, however, courts examining the nuances of the doctor-patient relationship realized that conceptually a cause of action based on lack of patient consent fit better into the framework of a negligence cause of action. See Marjorie Maguire Shultz, *From Informed Consent to Patient Choice: A New Protected Interest,* 95 *Yale L.J.* 219, 225 (1985) ("Given the absolute nature of battery, the narrowness of ·its defenses, and the breadth of its remedies, doctors could end up paying significant damages after providing faultless medical treatment, simply because some minor informational aspect of the consent process was questioned.").

By the mid-twentieth century, as courts began to use a negligence theory to analyze consent causes of action, the case law evolved from the notion of consent to *informed* consent, balancing the patient's need for sufficient information with the doctor's perception of the appropriate amount of information to impart for an informed decision. See *Largey, supra,* 110 *N.J.* at 208, 540 *A.*2d 504 (quoting *Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees,* 154 *Cal.App.*2d 560, 317 *P.*2d 170, 181 (Cal.App.1957) ("[a] physician violates his duty to the patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment.")).

 The doctrine of informed consent continued to be refined. See *Natanson v. Kline,* 186 *Kan.* 393, 350 *P.*2d 1093, 1106, *modified on other grounds,* 187 *Kan.* 186, 354 *P.*2d 670 (1960) (holding that doctor's required disclosure was "limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances," known as the "professional standard"). Eventually, the "prudent patient," or "materiality of risk" standard was introduced. *Canterbury v. Spence,* 464 *F.*2d 772, 786–88 (D.C.Cir.1972), *cert. denied,* 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L.Ed.*2d 518 (1972). That patient-centered view of informed consent stresses the patient's right to self-determination, and the fiduciary relationship between a doctor and his or her patients. *Id.* at 781–82. The standard balances the patient's need for material information with the discretion to be exercised by the doctor, and requires a physician to disclose material information to the patient even if the patient does not ask questions. *Ibid.* "A risk would be deemed 'material' when a reasonable patient, in what the physician knows or should know to be the patient's position, would be 'likely to attach significance to the risk or cluster of risks' in deciding whether to forgo the proposed therapy or to submit to it." *Largey, supra,* 110 *N.J.* at 211–212, 540 *A.*2d 504 (quoting *Canterbury, supra,* 464 *F.*2d at 787).

■ In New Jersey, as in most jurisdictions, informed consent is "a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to 'evaluate knowledgeably the options available and the risks attendant upon each' before subjecting that patient to a course of treatment." *Perna v. Pirozzi,* 92 *N.J.* 446, 459, 457 *A.*2d 431 (1983) (quoting *Canterbury, supra,* 464 *F.*2d at 780). Although we originally followed the·"professional" standard for assessing claims of informed consent, *Kaplan v. Haines,* 96 *N.J.Super.* 242, 257, 232 *A.*2d 840 (App.Div.1967), *aff'' d.o.b.,* 51 *N.J.* 404, 241 *A.*2d 235 (1968), that standard was replaced by the "prudent patient" standard set forth in *Canterbury. Largey, supra,* 110 *N.J.* at 216, 540 *A.*2d 504.

■ Thus, to sustain a claim based on lack of informed consent, the patient must prove that the doctor withheld pertinent medical information concerning the risks of the procedure or treatment, the alternatives, or the potential results if the procedure or treatment were not undertaken. *Perna, supra,* 92 *N.J.* at 460, 457 *A.*2d 431 (citation omitted). *See also Matthies v. Mastromonaco,* 160 *N.J.* 26, 34–35, 733 *A.*2d 456 (1999) (noting requirement of exploring medically reasonable invasive and noninvasive alternatives, including risks and likely outcomes of both). The information a doctor must disclose depends on what a reasonably prudent patient would deem significant in determining whether to proceed with the proposed procedure. *Largey, supra,* 110 *N.J.* at 211–212, 540 *A.*2d 504.

■ A plaintiff seeking to recover under a theory of lack of informed consent also must prove causation, *id.* at 215, 540 *A.*2d 504, thereby requiring a plaintiff to prove that a reasonably prudent patient in the plaintiff's position would have declined to undergo the treatment if informed of the risks that the defendant failed to disclose. *Canesi v. Wilson,* 158 *N.J.* 490, 504–05, 730 *A.*2d 805 (1999) (citation omitted). If the plaintiff would have consented to the proposed treatment even with full disclosure, the

burden of proving causation is not met. *Largey, supra,* 110 *N.J.* at 215–16, 540 *A.*2d 504. Accordingly,

[t]o establish a *prima facie* case for medical negligence premised on a theory of liability for lack of informed consent, a plaintiff must show "(1) the physician failed to comply with the [reasonably–prudent–patient] standard for disclosure; (2) *the undisclosed risk occurred and harmed the plaintiff;* (3) a reasonable person under the circumstances would not have consented and submitted to the operation or surgical procedure had he or she been so informed; and (4) *the operation or surgical procedure was a proximate cause of plaintiff's injuries.*"

[*Teilhaber, supra,* 320 *N.J.Super.* at 465, 727 *A.*2d 518 (citations omitted) (emphasis added).]

 The damages analysis in an informed consent case involves a comparison between the condition a plaintiff would have been in had he or she been properly informed and not consented to the risk, with the plaintiff's impaired condition as a result of the risk's occurrence. *Canesi, supra,* 158 *N.J.* at 505, 730 *A.*2d 805 (citations omitted) (noting that "there must be medical causation [from the procedure], that is, a causal connection between the undisclosed risk [of the procedure performed] and the injury ultimately sustained"). Our case law does not require a plaintiff to prove that the physician deviated from the standard of care in performing the operation or procedure; the physician's negligence is in the inadequate disclosure and the damages claimed derive from the harm to the patient caused by a procedure that would not have occurred if the disclosure had been adequate. *Id.* at 506, 730 *A.*2d 805 (analyzing causation requirements of informed consent and wrongful birth actions; although both require disclosure of risks that reasonably prudent patient would consider material, informed consent action requires plaintiff to demonstrate that undisclosed risk materialized and injury to patient resulted from treatment provided). In summary, in an action based on lack of informed consent,

the plaintiff must prove not only that a reasonably prudent patient in [his or] her position, if apprised of all material risks, would have elected a different course of treatment or care. In an informed consent case, the plaintiff must additionally meet a two-pronged test of proximate causation: [he or] she must prove that the undisclosed risk actually materialized and that it was medically caused by the treatment.

[*Ibid.*]

## B.

Our common law also authorizes a medical battery cause of action where a doctor performs a surgery without consent, rendering the surgery an unauthorized touching. *Perna, supra,* 92 *N.J.* at 460–61, 457 *A.2d* 431. Because battery is an intentional tort, it is reserved for those instances where either the patient consents to one type of operation but the physician performs a substantially different one from that for which authorization was obtained, or where no consent is obtained. *Matthies, supra,* 160 *N.J.* at 35, 733 *A.2d* 456 (citing 3 David W. Louisell & Harold Williams, *Medical Malpractice* §§ 22.02, 22.03 (1999)); *Samoilov v. Raz,* 222 *N.J.Super.* 108, 119, 536 *A.2d* 275 (App.Div. 1987).

In circumstances where the surgery that was performed was authorized with arguably inadequate information, however, an action for negligence is more appropriate. *Tonelli v. Khanna,* 238 *N.J.Super.* 121, 126–27, 569 *A.2d* 282 (App.Div.), *certif. denied,* 121 *N.J.* 657, 583 *A.2d* 344 (1990). Battery actions are less readily available in part because of the severity of their consequences. In an action for battery, a patient need not prove that the physician deviated from either the applicable standard for disclosure or the standard for performance of the operation. *Perna, supra,* 92 *N.J.* at 460–61, 457 *A.2d* 431. Accordingly, "[a]n operation undertaken without [any] consent (battery) even if perfectly performed with good medical results may entitle a plaintiff to at least nominal and even punitive damages." *Whitley–Woodford v. Jones,* 253 *N.J.Super.* 7, 11, 600 *A.2d* 946 (App.Div.1992) (citations omitted).

The decision in *Perna* represents the unusual circumstance where the consent granted was vitiated, rendering the circumstances the equivalent of an unauthorized touching-in other words, a battery. In that matter, the defendant urologists were part of a medical group that operated as a self-described "team." *Perna, supra,* 92 *N.J.* at 451, 457 *A.2d* 431. Their method of operation included a decision made immediately prior to a surgical proce-

dure designating the specific member of the group who was to perform the surgery. Unaware of that practice, the plaintiff entered the hospital on the advice of his family physician for tests and a urological consultation. In the hospital, the plaintiff was examined by one physician member of the practice group who previously had treated the plaintiff for a bladder infection. *Ibid.* The doctor recommended the removal of kidney stones and the plaintiff signed a consent form naming that physician as the surgeon. The operation ultimately was performed by two other physicians from the practice group, both of whom were unaware that only the original doctor's name appeared on the consent form. *Id.* at 452, 457 *A.*2d 431. Post-surgical complications developed and the plaintiff became aware of the substitution of doctors. *Ibid.*

Plaintiff sued based on lack of informed consent. *Perna, supra,* 92 *N.J.* at 452, 457 *A.*2d 431. The court instructed the jury that the plaintiff could recover only if the substitution of surgeons caused his damages. *Id.* at 453, 457 *A.*2d 431. The jury found for the defendants, and on appeal the Appellate Division affirmed. *Id.* at 450, 457 *A.*2d 431. On certification to this Court, the matter was reversed and remanded. . *Id.* at 465–66, 457 *A.*2d 431. The Court referred to the substitution of surgeons as "ghost surgery" because the doctor to whom informed consent was given was not the surgeon who performed the surgery. In that circumstance, the Court concluded that that surgeon did not have the plaintiff's informed consent. *Id.* at 463 n. 3, 464–465, 457 *A.*2d 431 (citing *Judicial Council of the American Medical Ass' n,* Op. 8.12 (1982)). Denominating the matter a battery, the Court held that the plaintiff was entitled to "recover for all injuries proximately caused by the mere performance of the operation, whether the result of negligence or not." *Perna, supra,* 92 *N.J.* at 460–61, 457 *A.*2d 431. The Court held that if the patient suffers no injuries except those that may be foreseen from the operation, he then is entitled at least to nominal damages and, in an appropriate case, may be entitled to damages for mental anguish resulting from the

belated knowledge that the operation was performed by a doctor to whom he had not given consent. *Id.* at 461, 457 *A.*2d 431.

Thus, although a claim for battery will lie where there has been "ghost surgery" or where no consent has been given for the procedure undertaken, if consent has been given for the procedure only a claim based on lack of informed consent will lie. A claim based on lack of informed consent properly will focus then on the adequacy of the disclosure, its impact on the reasonable patient's assessment of the risks, alternatives, and consequences of the surgery, and the damages caused by the occurrence of the undisclosed risk. See W. Page Keeton, et al., *Prosser and Keeton on Torts* § 32 at 190 (5th ed.1984).

## III.

### A.

In finding that a deceit-based claim was appropriate in this matter, the Appellate Division analogized the allegations concerning Dr. Heary's misrepresentations about his credentials and experience to the "ghost surgery" situation discussed in *Perna. Howard, supra,* 338 *N.J.Super.* at 38–39, 768 *A.*2d 195. At the outset, we note that this case is not factually analogous to *Perna* where a different person from the one to whom consent was given actually performed the procedure. 92 *N.J.* at 451–52, 457 *A.*2d 431. Nor is this a case where someone impersonating a doctor actually touched a patient. See *Taylor v. Johnston,* 985 *P.*2d 460, 465 (Alaska 1999) (noting that "battery claim may lie if a person falsely claiming to be a physician touches a patient, even for the purpose of providing medical assistance"). Here, defendant explained the procedure, its risks and benefits, and the alternatives to the surgery. He then performed the procedure; another person did not operate in his stead as in the "ghost surgery" scenario. See Thomas Lundmark, *Surgery by an Unauthorized Surgeon as a Battery,* 10 *J.L. & Health* 287 (1995–1996) (defining

ghost surgery as "surgery by a surgeon [to whom] the patient has not consented"). The facts in *Perna* simply are not helpful here.

Few jurisdictions have confronted the question of what cause of action should lie when a doctor allegedly misrepresents his credentials or experience. Research has revealed only one jurisdiction that has allowed a claim based on lack of informed consent under similar circumstances. See *Johnson v. Kokemoor*, 199 *Wis.*2d 615, 545 *N.W.*2d 495, 498 (Wis.1996) (analyzing doctor's affirmative misrepresentation as claim for lack of informed consent and finding that reasonable person would have considered information regarding doctor's relative lack of experience in performing surgery to have been material in making intelligent and informed decision). Although some suggest that a claim based in fraud may be appropriate if a doctor actively misrepresents his or her background or credentials, we are aware of no court that has so held. *See, e.g., Bethea v. Coralli*, 248 *Ga.App.* 853, 546 *S.E.*2d 542, 544 (Ga.Ct.App.2001) (holding that patient may not bring claim for fraud independent of claim of medical malpractice); *Ditto v. McCurdy*, 86 *Hawai'i* 84, 947 *P.*2d 952, 958 (Hawaii 1997) (holding that failure to disclose lack of board certification as plastic surgeon, as opposed to other board certifications possessed, did not violate requirements for informed consent or render doctor liable for fraud); *Paulos v. Johnson*, 597 *N.W.*2d 316, 320 (Minn. Ct.App.1999) (allegation of misrepresentation is not actionable as independent fraud claim); *Spinosa v. Weinstein*, 168 *A.D.*2d 32, 571 *N.Y.S.2d* 747, 751–54 (N.Y.App.Div.1991) (holding that fraudulent representations made to plaintiff did not render her consent to foot surgery equivalent to absence of consent; rather, claim had to do with whether there was failure to obtain informed consent); *cf. Duttry v. Patterson*, 565 *Pa.* 130, 771 *A.*2d 1255, 1259 (Pa. 2001) (holding that alleged affirmative misstatement of credentials does not support claim for lack of informed consent, but suggesting that claim for misrepresentation may be appropriate).

■■■ The thoughtful decision of the Appellate Division notwithstanding, we are not convinced that our common law should be

extended to allow a novel fraud or deceit-based cause of action in this doctor-patient context that regularly would admit of the possibility of punitive damages, and that would circumvent the requirements for proof of both causation and damages imposed in a traditional informed consent setting. We are especially reluctant to do so when plaintiff's damages from this alleged "fraud" arise exclusively from the doctor-patient relationship involving plaintiff's corpectomy procedure. See *Spinosa, supra,* 571 *N.Y.S.2d* at 753 (citations omitted) (holding that concealment or failure to disclose doctor's own malpractice does not give rise to claim of fraud or deceit independent of medical malpractice, and noting that intentional tort of fraud actionable " 'only when the alleged fraud occurs separately from and subsequent to the malpractice ... and then only where the fraud claim gives rise to damages separate and distinct from those flowing from the malpractice' "). Accordingly, we hold that a fraud or deceit-based claim is unavailable to address the wrong alleged by plaintiff. We next consider whether a claim based on lack of informed consent is the more appropriate analytical basis for the amendment to the complaint permitted by the Appellate Division.

### B.

Our case law never has held that a doctor has a duty to detail his background and experience as part of the required informed consent disclosure; nor are we called on to decide that question here. See *In re Conroy,* 98 *N.J.* 321, 346, 486 *A.*2d 1209 (1985) (stating that informed consent doctrine anticipates "a patient's consent, obtained after explanation of the nature of the treatment, substantial risks, and alternative therapies.") (quoting Norman L. Cantor, *A Patient' s Decision to Decline Life Saving Medical Treatment: Bodily Integrity Versus the Preservation of Life,* 26 *Rutgers L.Rev.* 228, 346 (1973)); *Matthies, supra,* 160 *N.J.* at 36–41, 733 *A.*2d 456. *See generally* 3 David W. Louisell & Harold Williams, *Medical Malpractice* § 22.04(3)(a) (1998) (noting that ordinary scope of disclosure involves "information concerning (1)

the diagnosis; (2) the general nature of the contemplated procedure; (3) the risks involved; (4) the prospects of success; (5) the prognosis if the procedure is not performed; and (6) alternative medical treatments"). Courts generally have held that claims of lack of informed consent based on a failure to disclose professional-background information are without merit. *See, e.g., Ditto, supra,* 947 *P.*2d at 958 (holding that informed consent does not require doctor to "affirmatively disclose his or her [professional] qualifications or lack thereof to a patient"); *Foard v. Jarman,* 326 *N.C.* 24, 387 *S.E.*2d 162, 167 (N.C.1990) (finding that because informed consent statute imposed no affirmative duty to discuss experience, facts presented "no genuine issue regarding defendant's experience which [bore] on the issue of informed consent").

Although personal credentials and experience may not be a required part of an informed consent disclosure under the current standard of care required of doctors, the question raised in this appeal is whether significant misrepresentations concerning a physician's qualifications can affect the validity of consent obtained. The answer obviously is that they can.

In certain circumstances, a serious misrepresentation concerning the quality or extent of a physician's professional experience, viewed from the perspective of the reasonably prudent patient assessing the risks attendant to a medical procedure, can be material to the grant of intelligent and informed consent to the procedure. See 1 Dan B. Dobbs, *The Law of Torts,* § 251 at 660–61 (2001) (citing *Kokemoor, supra,* and discussing that some authority has begun to suggest that patient is entitled to information concerning doctor's experience in performing specific surgery). In *Kokemoor, supra,* the Supreme Court of Wisconsin reviewed a case in which the plaintiff alleged that her surgeon did not obtain her informed consent to perform a surgical procedure because he had misrepresented his experience in response to a direct question during a pre-operative consultation. 545 *N.W.*2d at 505. At trial, evidence was introduced suggesting that the type of surgery performed—basilar bifurcation aneurysm—was "among

the most difficult in all of neurosurgery." *Ibid.* The court found that evidence of the defendant's lack of experience was relevant to an informed consent claim because "[a] reasonable person in the plaintiff's position would have considered such information material in making an intelligent and informed decision about the surgery." *Ibid. See also Bethea, supra,* 546 *S.E.*2d at 544 (recognizing that fraudulent misrepresentation of facts material to consent may support claim based on lack of informed consent); *Paulos, supra,* 597 *N.W.*2d at 320 (suggesting misrepresentation by doctor that he was board certified in plastic surgery may present issue of informed consent).

 The allegation here is that defendant's misrepresentations concerning his credentials and experience were instrumental in overcoming plaintiff's reluctance to proceed with the surgery. The theory of the claim is not that the misrepresentation induced plaintiff to proceed with unnecessary surgery. See *Tonelli, supra,* 238 *N.J.Super.* at 128, 569 *A.*2d 282 (noting that plaintiff alleged that doctor performed unnecessary surgery for personal gain). Rather, plaintiff essentially contends that he was misled about material information that he required in order to grant an intelligent and informed consent to the performance of the procedure because he did not receive accurate responses to questions concerning defendant's experience in performing corpectomies and whether he was "Board Certified." Plaintiff allegedly was warned of the risk of paralysis from the corpectomy procedure; however, he asserts that if he had known the truth about defendant's qualifications and experience, it would have affected his assessment of the risks of the procedure. Stated differently, defendant's misrepresentations induced plaintiff to consent to a surgical procedure, and its risk of paralysis, that he would not have undergone had he known the truth about defendant's qualifications. Stripped to its essentials, plaintiff's claim is founded on lack of informed consent.

As noted earlier, a patient-specific standard of what is material to a full disclosure does not apply in a claim based on lack of

informed consent. Thus, plaintiff's subjective preference for a Board Certified physician, or one who had performed more corpectomies than defendant had performed, is not the actionable standard. Nonetheless, assuming the misrepresentations are proved, if an objectively reasonable person could find that physician experience was material in determining the medical risk of the corpectomy procedure to which plaintiff consented, and if a reasonably prudent person in plaintiff's position informed of the defendant's misrepresentations about his experience would not have consented, then a claim based on lack of informed consent may be maintained.

Modern advances in medicine coupled with the increased sophistication of medical consumers require an evolving notion of the reasonably prudent patient when assessing a claim based on lack of informed consent. See Schultz, *supra*, 95 *Yale L.J.* at 221–22. That said, most informed consent issues are unlikely to implicate a setting in which a physician's experience or credentials have been demonstrated to be a material element affecting the risk of undertaking a specific procedure. The standard requires proof on which an objectively reasonable person would base a finding that physician experience could have a causal connection to a substantial risk of the procedure. *Largey, supra*, 110 *N.J.* at 213–15, 540 *A.2d* 504 3 David W. Louisell & Harold Williams, *Medical Malpractice* § 22.05(3) (2001).

The alleged misrepresentations in this case about "physician experience" (credentials and surgical experience) provide a useful context for demonstrating the difficulty inherent in meeting the materiality standard required in order for physician experience to have a role in an informed consent case. We recognize that a misrepresentation about a physician's experience is not a perfect fit with the familiar construct of a claim based on lack of informed consent. The difficulty arises because physician experience is not information that directly relates to the procedure itself or one of the other areas of required medical disclosure concerning the procedure, its substantial risks, and alternatives that must

be disclosed to avoid a claim based on lack of informed consent. But the possibility of materiality is present. If defendant's true level of experience had the capacity to enhance substantially the risk of paralysis from undergoing a corpectomy, a jury could find that a reasonably prudent patient would not have consented to that procedure had the misrepresentation been revealed. That presumes that plaintiff can prove that the actual level of experience possessed by defendant had a direct and demonstrable relationship to the harm of paralysis, a substantial risk of the procedure that was disclosed to plaintiff. Put differently, plaintiff must prove that the additional undisclosed risk posed by defendant's true level of qualifications and experience increased plaintiff's risk of paralysis from the corpectomy procedure.

The standard for causation that we envision in such an action will impose a significant gatekeeper function on the trial court to prevent insubstantial claims concerning alleged misrepresentations about a physician's experience from proceeding to a jury. We contemplate that misrepresented or exaggerated physician experience would have to significantly increase a risk of a procedure in order for it to affect the judgment of a reasonably prudent patient in an informed consent case. As this case demonstrates, the proximate cause analysis will involve a two-step inquiry.

The first inquiry should be, assuming a misrepresentation about experience, whether the more limited experience or credentials possessed by defendant could have substantially increased plaintiff's risk of paralysis from undergoing the corpectomy procedure. We envision that expert testimony would be required for such a showing. The second inquiry would be whether that substantially increased risk would cause a reasonably · prudent person not to consent to undergo the procedure. If the true extent of defendant's experience could not affect materially the risk of paralysis from a corpectomy procedure, then the alleged misrepresentation could not cause a reasonably prudent patient in plaintiff's position to decline consent to the procedure. The court's gatekeeper function in respect of the first question will

require a determination that a genuine issue of material fact exists requiring resolution by the factfinder in order to proceed to the second question involving an assessment by the reasonably prudent patient. Further, the trial court must conclude that there is a genuine issue of material fact concerning both questions in order to allow the claim to proceed to trial.

Finally, to satisfy the damages element in a claim based on lack of informed consent, a plaintiff typically has to show a causal connection between the inadequately disclosed risk of the procedure and the injury sustained. *Canesi, supra,* 158 *N.J.* at 505, 730 *A.*2d 805. If that risk materialized and harmed plaintiff, damages for those injuries are awarded. *Ibid.* Here, if successful in his claim based on lack of informed consent, plaintiff may receive damages for injuries caused by an inadequately disclosed risk of the corpectomy procedure. However, as noted, to be successful plaintiff must prove that defendant's allegedly misrepresented qualifications and experience can satisfy the stringent test for proximate causation that is required for physician experience to be material to the substantial risk of the procedure that occurred (paralysis) and injured plaintiff. If he can, then plaintiff may be compensated for that injury caused by the corpectomy irrespective of whether defendant deviated from the standard of care in performing the surgical procedure.

In conclusion, plaintiff's medical malpractice action will address any negligence in defendant's performance of the corpectomy procedure. We hold that in addition plaintiff may attempt to prove that defendant's alleged misrepresentation about his credentials and experience presents a claim based on lack of informed consent to the surgical procedure, consistent with the requirements and limitations that we have imposed on such a claim.

## IV.

We reverse that portion of the decision below that would permit a separate action for fraud in view of our conclusion that misrepresentations concerning a physician's credentials and experience

ordinarily are to be cognizable in a claim based on lack of informed consent. All aspects of plaintiff's complaint against defendant arise out of plaintiff's consent to a medical procedure and defendant's performance of that procedure. Permitting a cause of action based on lack of informed consent, in addition to the malpractice action, is all that is required and appropriate to address plaintiff's allegations.

The judgment of the Appellate Division is affirmed in part, and reversed in part. The matter is remanded to the trial court to allow plaintiff the opportunity to amend his complaint to allege lack of informed consent, consistent with the requirements for prevailing on that claim as set forth in this opinion.

*For affirmance in part; reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.