NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1642-15T2

THE ESTATE OF ANNA MARIE
CYCKOWSKI BY ITS EXECUTOR
STEVEN CYCKOWSKI,

 Plaintiff-Respondent/
 Cross-Appellant,

v.

JAY STYLMAN, M.D.,

 Defendant-Appellant/
 Cross-Respondent,

and

SANIEA F. MAJID, M.D., JOSEPH
FELDMAN, D.P.M., and ST. MICHAELS
MEDICAL CENTER,

 Defendants.

________________________________

 Argued May 9, 2017 - Decided June 23, 2017

 Before Judges Reisner, Rothstadt and Mayer.

 On appeal from the Superior Court of New
 Jersey, Law Division, Essex County, Docket No.
 L-7062-13.

 David Parker Weeks argued the cause for
 appellant/cross-respondent (Ruprecht Hart
 Weeks & Ricciardulli, attorneys; Mr. Weeks,
 of counsel and on the brief; Andrea G. Miller-
 Jones, on the brief).

 James Lynch argued the cause for
 respondent/cross-appellant (Lynch, Lynch,
 Held & Rosenberg, attorneys; Mr. Lynch, on the
 brief).

PER CURIAM

 Anna Marie Cyckowski (Ms. Cyckowski or the patient), a

seventy-four year old woman, experienced complications after her

esophagus was punctured during surgery to repair a hiatal hernia.

She died a few weeks later. Plaintiff, her estate, claimed that

the operating surgeon, defendant Dr. Jay Stylman, did not render

proper medical treatment after the surgery. Plaintiff also claimed

lack of informed consent. The jury returned a no-cause verdict

on the informed consent claim. However, the jury found that

defendant deviated from accepted medical standards in treating Ms.

Cyckowski. The jury also found that the deviation was a

substantial factor in causing her injuries, and defendant did not

prove that some portion of her injuries would have occurred even

if he had not deviated.

 Defendant appeals from the resulting December 7, 2015

judgment, consisting of $200,000 in pain and suffering damages,

plus about $240,000 in medical expenses. Plaintiff filed a

protective cross-appeal, asserting that if we reverse the

 2 A-1642-15T2
malpractice judgment and remand the case for a re-trial, we should

also order a re-trial of the informed consent claim.

 In challenging the verdict, defendant presents the following

points of argument:

 I. DEFENDANT'S MOTION FOR A DIRECTED VERDICT
 THAT DEFENDANT HAD PROVEN SOME PORTION
 OF PLAINTIFF'S INJURIES WOULD HAVE
 OCCURRED EVEN IF DEFENDANT HAD NOT BEEN
 NEGLIGENT SHOULD HAVE BEEN GRANTED

 II. THE JURY'S FINDING THAT NO PORTION OF
 PLAINTIFF'S INJURIES WAS DUE TO THE PRE-
 EXISTING CONDITION WAS AGAINST THE WEIGHT
 OF THE EVIDENCE

 III. THE TESTIMONY OF GASTROENTEROLOGIST DR.
 ELFANT SHOULD HAVE BEEN LIMITED, NOT
 BARRED IN ITS ENTIRETY

 IV. THE FACT THAT DR. STYLMAN HAD NOT
 PREVIOUSLY PERFORMED THIS SPECIFIC
 PROCEDURE LAPAROSCOPICALLY AS PRIMARY
 SURGEON SHOULD NOT HAVE BEEN PRESENTED
 TO THE JURY

 V. DR. BELSLEY'S PERSONAL INFORMED CONSENT
 PRACTICES SHOULD NOT HAVE BEEN ALLOWED
 TO BE ELICITED BY PLAINTIFF'S COUNSEL

 VI. THE WHOLLY INADEQUATE RECORD PROVIDED BY
 THE COURT PREJUDICED DR. STYLMAN'S
 ABILITY TO CONTEST ALL APPEALABLE ISSUES
 RAISED AT TRIAL DUE TO A COMPLETE LACK
 OF RECORDING OF KEY SIDE-BAR DISCUSSIONS

 Defendant did not perfect the appeal as to his point VI, by

filing a motion to reconstruct the trial record. See R. 2:5-5(a).

Nor has he articulated which of the un-recorded sidebar rulings

 3 A-1642-15T2
allegedly constituted, or might have constituted, prejudicial

error. Consequently, we decline to further address this point.

After reviewing the record including the trial transcripts, we

find no merit in any of defendant's remaining appellate arguments,

and we affirm on the appeal. We therefore need not address the

cross-appeal.

 I

 To put the legal issues in context, we set forth the most

pertinent trial evidence. In brief summary, plaintiff did not

contend that defendant was negligent in puncturing the patient's

esophagus, which was a known but uncommon risk of the surgery.

Rather, plaintiff contended that when the patient showed signs of

complications after the surgery, defendant did not promptly take

steps to rule out the possibility that she had a punctured

esophagus and treat the condition if it existed. According to

plaintiff's evidence, the appropriate steps would have included

performing follow-up surgery within a day or two to locate a

possible puncture, and promptly bringing in a gastroenterologist

to further examine the patient after the second surgery did not

reveal the location of the hole. Plaintiff asserted that, because

the punctured esophagus was not timely discovered and properly

treated, the patient developed a horrendous infection, and other

 4 A-1642-15T2
painful and debilitating symptoms which eventually led to her

death.

 Dr. Angelo Scotti, plaintiff's expert in internal medicine

and infectious diseases, described the patient's condition and the

development of the infection. Dr. Scotti explained that Ms.

Cyckowski had a hiatus hernia, which he described as "an opening

where the esophagus goes and some of the intestinal contents can

get up into the chest wall." During the surgery to repair this

problem, she suffered a perforation of her esophagus. The

perforation allowed bacteria to enter the mediastinum, which

eventually developed into a mediastinal infection.

 Dr. Scotti testified that the infection eventually entered

her blood stream, which caused her to go into septic shock, i.e.,

"her blood pressure dropped and her entire body was responding to

this infection." According to Dr. Scotti, Ms. Cyckowski continued

to get sicker and eventually died from complications of the

surgery.

 Dr. Scotti explained that an esophageal perforation is a

medical emergency, because "you have acid from the stomach that

goes through the hole and starts destroying tissues because acid

is for digesting things. And then the bacteria there get in there

and set up infection and that's what happened here." He provided

the following analogy for an esophageal perforation:

 5 A-1642-15T2
 If you're in a boat and you have a hole in
 your boat and you really want to stay afloat
 and you keep bailing, bailing, bailing, well,
 if you have an esophageal perforation, you
 aren't plugging the hole. So that water keeps
 coming in, you bail it out, it keeps coming
 in. So if you plug the hole in the boat, then
 the water stops and you can bail it out and
 you'll have a floating boat.

 So, again, when you have a perforation
 of the esophagus and that infection is being
 set up and you have a collection of infection,
 like, abscess, if you close the perforation,
 then between the antibiotics and your immune
 system you have a good chance of healing that.
 But if [it] keeps open, you still have
 bacteria and acid coming into the area, so
 you're fighting a losing battle. You're
 [basically] bailing a boat that still has a
 hole in it.

 Dr. Scotti further testified that bacteria continues to enter

through the perforation even if the "patient has antibiotics, a

feeding tube, and drains" and the infection cannot be eradicated.

He then detailed Ms. Cyckowski's decline starting on April 10

through her release from the hospital at the end of May. During

that testimony, he detailed how the lack of appropriate treatment

allowed the patient to develop septic shock:

 Q: She had now gone from the 10th to the
 27th with continued contamination from
 this open perforation. Is that fair to
 say?

 A: Of her esophagus into her mediastinum,
 yes.

 6 A-1642-15T2
 Q: Do you have an opinion as to the affect
 this had on the patient?

 A: Well, it drastically decreases her
 prognosis. In other words, she's at more
 risk of dying. Just to start back when
 she had septic shock on 4/16, April 16th,
 when you have septic shock, if you don't
 get treatment for septic shock, you --
 you start dying. Septic shock is 100
 percent fatal if it's not treated. And
 the mortality increases by 7 percent for
 each hour of treatment that's missed. So
 if it's delayed an hour you increase your
 [mortality] to 7 percent, by two hours
 it's 14 percent.

 Now, she didn't die at that point because
 they were at least partially treating
 her. They were giving antibiotics and
 they were giving fluids. So they were
 partially keeping up with this
 contamination, but not enough to cure her
 because of the perforation.

 He opined that, throughout this time period, the infection

was getting worse, Ms. Cyckowski was getting sicker and her

prognosis was worsening. Dr. Scotti concluded that had the

perforation been blocked "within three or four, five days of

surgery," Ms. Cyckowski probably would have healed completely.

Dr. Scotti explained that, had the perforation been diagnosed and

treated earlier:

 [S]he would have avoided the -- all the other
 procedures. She would have avoided having --
 she would have avoided dying for one thing.
 But she would have avoided the various
 procedures that were done. The plural
 infusion, they had to put a chest tube and

 7 A-1642-15T2
 take her infusion. She probably would have
 avoided intubation, so she wouldn't have had
 the tube in and would not have gotten
 pneumonia. She would have avoided the shock,
 so she wouldn't have had a central venous
 line. Basically, all of the procedures that
 she had to keep her alive would have been
 avoided. She would avoided being transferred
 to another hospital because she most likely
 would have recovered and left the hospital
 after her surgery.

 Dr. Scotti testified that, on May 22, Ms. Cyckowski was

transferred to the Kendrick subacute rehabilitation center, where

she was "pretty much bedridden." While at this facility, "she

developed decubitus ulcers . . . [that] are the pressure sores you

get when you're laying on bony prominences for a period of time."

 Finally, Dr. Scotti explained the association between her

death and the esophageal perforation:

 I mean, when she went into the hospital she
 was cleared medically and reasonably so. In
 other words, she was judged a reasonable
 medical risk. She had, you know, none of
 these. She had a history of asthma and she
 had no serious heart disease. And then she
 goes on to die a cardiovascular death, you
 know, weeks -- months after her surgery. But
 she never gets better.

 So the surgery, the perforation sets up
 a crescendo. The mediastinal infection,
 systemic infection, shock, respiratory
 failure, urinary tract infection, decubitus
 ulcers, all of those things result in really
 taxing your body and put you on an
 inflammatory response -- that's inflammatory
 response we talked about. That inflammatory
 response makes your heart work harder, it

 8 A-1642-15T2
 makes you more likely to clot. So some
 combination of those things caused her to die.
 There was no autopsy, so I can't pinpoint of
 what all the things I mentioned which one of
 those or which combination caused her to die.

 Dr. Robert Aldoroty, a board certified general surgeon,

testified about defendant's deviation from accepted medical

standards in treating the patient after the surgery. Dr. Aldoroty

testified that esophageal perforation is a known risk to Ms.

Cyckowski's operation. It is important to be aware of the

potential of an esophageal perforation, because of "the potential

enormity of the complications" of a perforation.

 Dr. Aldoroty detailed the events starting with Ms.

Cyckowski's surgery. He opined that defendant was not necessarily

negligent in the surgery, because "[perforation] can happen under

the best of circumstances." However, Dr. Aldoroty explained that

defendant deviated from the standard of care with respect to his

post-operative treatment:

 So the issue really, the first issue is the
 delay in getting Ms. Cyckowski to the remedial
 surgery. Okay? It's four or five days delay.
 It's entirely unacceptable. We spoke about
 this, but any surgeon who operates on the
 esophagus is doing paraesophageal hernias.
 When a patient isn't doing well, an esophagus
 perforation is in the short list. And it's
 in the short list because delays in diagnosis
 and treatment of an esophageal perforation
 have significant health consequences for the
 patient.

 9 A-1642-15T2
 . . . I'm not upset with the
 postoperative day one unless an esophageal
 perforation wasn't in Dr. Stylman's mind, and
 I don't know what was in Dr. Stylman's mind.
 But what’s in the chart is reasonable.

 But postoperative day two, where she goes
 into florid respiratory distress and needs to
 be intubated and sent to an ICU, there is a
 short list of postoperative complications that
 can do that: pulmonary embolus, esophageal
 perforation, cardiac event, myocardial
 infarction, a heart attack, pneumothorax. And
 that’s the short list. . . .

 My problem at that point is that she's
 sitting in an ICU and no one is ordering any
 tests to find anything out. And Dr. Stylman
 should have that short list and should be
 clunking through it very expeditiously in the
 first few hours.

 . . . .

 So I think in my opinion any reasonable
 doctor or surgeon would have gotten a CT of
 the chest, abdomen and pelvis

 . . . .

 And would have gotten a CT that was
 appropriate, appropriately done to look for
 pulmonary embolus. The ICU would have taken
 care of the EKG, the proponent ruling out the
 cardiac event.

 Dr. Aldoroty concluded that the surgeon should notify the

members of the ICU of the potential surgical complications and to

recommend the appropriate testing. In order to rule out an

esophageal perforation, Dr. Aldoroty said that defendant should

have ordered a CT scan. Dr. Aldoroty opined that defendant

 10 A-1642-15T2
deviated from the standard of care by not ordering a CT scan on

post-operative days two and three. Then when he ordered a scan,

and realized Ms. Cyckowski had an esophageal perforation, it was

a deviation not to perform the surgery immediately.

 Further, Dr. Aldoroty testified that defendant deviated from

the standard of care by failing to call a gastroenterologist from

April 15 through April 24. He testified that had the perforation

been diagnosed earlier, on April 12 or 13, "the more likely it is

that the patient will recover quicker . . . and will be less likely

to succumb from the perforation." He concluded that Ms.

Cyckowski's death was ultimately due to the delay in diagnosing

the esophageal perforation.

 Plaintiff also presented Dr. Peter Salvo, who gave detailed

testimony concerning the pain and suffering Ms. Cyckowski

experienced and the timing of her suffering. Dr. Salvo first

described the pain that Ms. Cyckowski suffered starting a few days

after the surgery. He testified that later, during her hospital

stay, Ms. Cyckowski developed decubitus ulcers, which cause

significant pain. Dr. Salvo provided the following opinion

regarding her pain while she was at Kindred:

 I think there are two things you need to know.
 I think that no pain medicine is 100 percent
 effective. You would like to take down the
 pain as much as you can. But those of us who
 deal in pain every day realize that pain is

 11 A-1642-15T2
 one of the most fundamental deep-seeded
 neurologic reflexes we have. . . .

 So we try to get at the pain as best we
 can. Narcotics work. They make your life
 better, truly they do. But they don't make
 it 100 percent better.

 And she was described as feeling short
 of breath. That's -- that's not pain, that's
 distress. She said on the 10th of June "I
 can't breathe." She was anxious. She
 complained of pain in her sacral area where
 that decubitus was on May 6th. On May 27th
 she had lower extremity pain. On the 31st of
 May she complained of buttock pain. She had
 facial grimacing on the 24th of June.

 I think it's fair to say that not every
 note at Kindred says that she was in terrible
 pain and that's probably true. Pain comes and
 goes. But her baseline, her general life was
 painful. And sometimes it was worse,
 sometimes it was better, sometimes the meds
 worked better, sometimes they didn't. This
 is biology, it's not physics. The best you
 can do is often, unfortunately, good enough,
 that's it.

 Defendant's case was directed at establishing that he did not

deviate from the standard of care. In his testimony, defendant

detailed the procedure he performed on Ms. Cyckowski and concluded,

"it went very well." The first day after the surgery, defendant

believed Ms. Cyckowski was doing well. The second day after

surgery, April 12, defendant noted in his chart: "[p]atient

sedated, relatively stable, on vent support. Increased fluid --

increased fluids rather. Abdomen soft, non-tender. Continue CRR

 12 A-1642-15T2
management." Defendant explained that something happened that

affected "her ability to breathe properly where the carbon dioxide

was building up in her lungs. And that's an emergency that

requires a ventilator to support her, which they did in the ICU."

 At this point, defendant did not believe Ms. Cyckowski had

an infection, because she did not show any signs of one. On April

14, defendant testified that a culture came back positive for

bacteria in Ms. Cyckowski's lungs, and he ordered a CT scan.

Defendant was notified early in the morning on April 15 that Ms.

Cyckowski had a leak in her esophagus in the surgical area. But

defendant did not report to the hospital to perform surgery

immediately, for two reasons. First, he wanted to review the

films with a radiologist, and second, performing surgery in the

middle of the night does not generally lead to the best results

for the patient.

 Defendant testified that the second procedure, on April 15,

was "a much more serious, dangerous, complicated procedure

. . . ." During the procedure, defendant placed multiple drains

in Ms. Cyckowski to remove any fluid build-up in her abdomen, but

he did not locate the perforation in the esophagus. At this time,

defendant believed that the hole would heal since he inserted the

drains.

 13 A-1642-15T2
 After the procedure on April 15, defendant did not immediately

attempt to put a stent in because he thought it was too risky

given Ms. Cyckowski's condition. Defendant explained his thought

process each day from April 16 through April 25, telling the jury

why he though his actions were reasonable based on the

circumstances. He explained that he did not call the

gastroenterologist until April 25, because "the signs were

pointing to the fact that it seemed like the drainage was

decreasing. . . . And it seemed like everything was going along

in the right direction as far as the . . . leak was going while

there were many other problems that were happening at the same

time."

 Next, defendant called his only expert, Dr. Scott Belsley, a

board certified general surgeon. Dr. Belsley testified that the

surgery was "straightforward" and initially everything was fine

after the surgery. He testified that it was appropriate to obtain

a CT scan on April 14 and it was important that defendant inserted

drains, "because the vast majority of all these perforations heal

by just letting the body do its own thing."

 Dr. Belsley testified that defendant performed the initial

operation on April 10 in accordance with the standard of care.

Further, he testified that the first sign of an infection was from

 14 A-1642-15T2
the "positive respiratory culture" on April 14. He went on to

explain:

 Even having said that then we can argue okay,
 is that normal bacteria, is that abnormal
 bacteria? So, when you're trying to decide
 what's happening while it's happening, in
 these situations you put the patient on
 antibiotics, you get some x-rays, you run some
 cultures and you're trying to figure out while
 it's happening, and it's not -- during the
 whole process. But I would say on the 14th,
 that's when we would have a -- a really
 positive indication that there was an
 infection.

 He opined that defendant did not deviate from the standard

of care by not diagnosing the infection and perforation before

April 15. He also opined that Ms. Cyckowski suffered a delayed

perforation, because if the perforation had occurred during

surgery, she would have had an elevated heart rate and a fever

sooner.

 Regarding the second operation on April 15, Dr. Belsley

explained that defendant was not negligent in waiting until the

morning instead of performing the operation in the middle of the

night. He also testified that defendant was not negligent in

refraining from calling in a gastroenterologist prior to April 27.

Dr. Belsley primarily based that opinion on his view that the

typical treatment provided by gastroenterologists - the placement

of stents to block the puncture - was ineffective. He admitted,

 15 A-1642-15T2
however, that his was a minority view in the medical profession.

In Dr. Belsley's experience, esophageal perforations will heal

"greater than 90 percent of the time with drainage alone . . . ."

 Dr. Belsley summarized his opinion regarding defendant's

overall treatment of Ms. Cyckowski:

 There was absolute no deviation in any
 aspect in this case.

 . . . .

 I mean the basis of -- is a very serious
 medical problem, surgical problem, which is
 likely going to kill a sick patient within two
 years, it's a very risky operation. This is
 a known complication of the operation, this
 is accepted. This is what every surgeon will
 say yes, of course it can happen. It's not
 common, but yes, this is a possibility. And
 when they did notice this, when they have
 absolute evidence with the CAT scan, they got
 all the right people involved, they did got
 rushing in in [sic] the middle of the night,
 he performed a very smart, very technically
 correct operation to deal with the problem.
 [He] had specialists that were taking care of
 her throughout the hospitalization, but
 unfortunately she succumbed. She was a very
 sick lady.

 Dr. Belsley testified that Ms. Cyckowski's death "was related

to her preexisting conditions." Further he explained that "you

can't basically reduce it to one event, and discount all of the

preexisting things." He was not asked to quantify or apportion

which of the patient's injuries were attributable to her pre-

existing conditions and which were attributable to any deviations,

 16 A-1642-15T2
assuming, hypothetically, that defendant had deviated from

accepted medical standards.

 II

 Defendant's first two points concern his right to

apportionment of damages under Scafidi v. Seiler, 119 N.J. 93, 108

(1990), which applies when a defendant's malpractice aggravates

or increases the risk posed by a patient's pre-existing medical

condition. Initially, defendant contends he was entitled to a

directed verdict on apportionment. See R. 4:40-1. We review the

issue de novo, and find no error in the trial court's decision.

See Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016).

 In the trial court, plaintiff agreed that this was a case to

which Scafidi applied, because there was no dispute that Ms.

Cyckowski had one or more pre-existing conditions, which plaintiff

contended were aggravated by defendant's malpractice. However,

as set forth in Scafidi, defendant had the burden of proof on the

apportionment issue:

 [W]here the malpractice or other tortious act
 aggravates a preexisting disease or condition,
 the innocent plaintiff should not be required
 to establish what expenses, pain, suffering,
 disability or impairment are attributable
 solely to the malpractice or tortious act, but
 that the burden of proof should be shifted to
 the culpable defendant who should be held
 responsible for all damages unless he can
 demonstrate that the damages for which he is

 17 A-1642-15T2
 responsible are capable of some reasonable
 apportionment and what those damages are.

 [Scafidi, supra, 119 N.J. at 110 (quoting
 Fosgate v. Corona, 66 N.J. 268, 272-73
 (1974)).]

 At the close of the evidence, defense counsel moved for a

directed verdict on jury question #8, which asked whether defendant

had proven that some portion of the patient's injuries would have

occurred, even if defendant had not deviated from the standard of

care. Defense counsel argued that plaintiff's expert, Dr.

Aldoroty, had testified that even if defendant had realized earlier

that more surgery was needed and had performed the surgery on

April 12 instead of April 15, "the attendant recovery from that

surgery would [still] have taken place." The judge reserved

decision on the motion, and denied it immediately after the jury

returned its verdict.1 See R. 4:40-2(a) (the trial court may

reserve decision on a motion for a directed verdict and decide it

within ten days after the jury returns its verdict).

 We find no error in the result. On a motion for judgment

under Rule 4:40-1, "[t]he court must accept as true all evidence

supporting the position of the non-moving party, according that

1
 The judge indicated that she would provide reasons for her
decision, as is required, but would do so at a later time. See
Atlas v. Silvan, 128 N.J. Super. 247, 250 (App. Div. 1974). From
the record provided to us, it is not clear whether the judge did
so.

 18 A-1642-15T2
party the benefit of all legitimate inferences that can be deduced

from such evidence. If reasonable minds could differ, the court

must deny the motion." Rena, Inc. v. Brien, 310 N.J. Super. 304,

311 (App. Div. 1998); see Dolson v. Anastasia, 55 N.J. 2, 5-6

(1969). Viewing the evidence in the light most favorable to

plaintiff, the jury did not necessarily need to find that the

three-day delay from April 12 to April 15 constituted the deviation

that caused the patient's injuries. Plaintiff also presented

evidence that defendant negligently delayed for ten days after the

surgery before calling in a gastroenterologist on April 25.

Defendant's Rule 4:40-1 motion did not even address that deviation

or the resulting injuries and suffering caused by that delay.

 Moreover, defendant's case, as presented through his

witnesses, was that there was no deviation. He did not present

testimony that, even if there had been a deviation, a certain

percentage of the patient's injury was attributable to the pre-

existing condition. Neither defendant nor Dr. Belsley provided

any testimony that would have enabled the jury to make the

percentage apportionment Scafidi requires.

 It was defendant's burden to present that evidence. "If a

defendant seeks to reduce his liability by asserting that part of

the harm is not attributable to his tortious conduct, the burden

of proving both that the plaintiff's injury is capable of

 19 A-1642-15T2
apportionment and what the apportionment should be should rest on

the defendant." Anderson v. Picciotti, 144 N.J. 195, 211 (1996)

(citation omitted); see also Holdsworth v. Galler, 345 N.J. Super.

294, 305-06 (App. Div. 2001). In addition, even if defendant had

presented testimony on apportionment, it would have been the jury's

province to decide if the testimony was credible. As a result,

we conclude that defendant was not entitled to a directed verdict

on question #8.

 Defendant's second argument - that the jury's verdict as to

question #8 was against the weight of the evidence - was waived

for purposes of appeal when he failed to file a motion for a new

trial on that ground. R. 2:10-1; Gebroe-Hammer Assocs. v. Sebbag,

385 N.J. Super 291, 295 (App. Div.), certif. denied, 188 N.J. 219

(2006). Moreover, even if we consider the issue, the verdict was

not a miscarriage of justice. R. 2:10-1.

 III

 Next, defendant argues that the trial judge should not have

barred the testimony of Dr. Elfant, a board certified

gastroenterologist. We review a trial judge's decision to admit

or exclude expert testimony for abuse of discretion. See Townsend

v. Pierre, 221 N.J. 36, 52-53 (2015). We find none here, and we

affirm substantially for the reasons stated by the trial judge in

 20 A-1642-15T2
ruling on plaintiff's in limine motion on October 28, 2015. We

add these comments.

 Defendant was a board certified general surgeon. He concedes

that under the New Jersey Medical Care Access and Responsibility

and Patients First Act (PFA), N.J.S.A. 2A:53A-41, he could not

present the testimony of a gastroenterologist to opine as to the

standard of care or as to whether defendant's conduct met that

standard. See Nicholas v. Mynster, 213 N.J. 463, 468 (2013).

Defendant argues that Dr. Elfant was not going to testify about

the standard of care, but rather was going to testify about

proximate cause and damages. However, having read Dr. Elfant's

expert report, we conclude that it was clearly aimed at

establishing the standard of post-operative care for a patient who

has undergone hiatal hernia surgery and establishing that

defendant did not deviate from that standard. In fact, the report

began by stating: "Plaintiff's expert alleges a number of

deviations in the care of Mrs. Cyckowski which I would like to

address[.]"

 Moreover, in arguing the in limine motion, defense counsel

did not make a proffer that Dr. Elfant would testify about

proximate cause and damages. He stated:

 The only thing I intend to elicit from Elfant
 is that he is a gastroenterologist[,] is
 familiar with and often will treat

 21 A-1642-15T2
 perforations conservatively before stenting.
 And that's after the 15th of April 2012. And
 it's not saying anything about standard of
 care. It's just saying this is a recognized
 treatment.

 The judge rejected that argument, noting that "since that

care was not performed by a gastroenterologist, a general surgeon

should address that issue on behalf of the defense." We agree.

On the record presented to the trial judge at the time she decided

the in limine motion, it was clear that the defense proposed to

use Dr. Elfant's testimony as a back-door means of providing

standard-of-care testimony prohibited by the PFA. It was not an

abuse of discretion to grant plaintiff's pre-trial motion to bar

the expert.2

 IV

 Defendant's remaining two arguments relate to evidence of his

lack of prior experience with the type of surgery he performed on

Ms. Cyckowski, and to a testifying expert's practice with respect

to obtaining informed consent from patients. We conclude that the

2
 Defendant's appellate arguments, concerning possible additional
issues about which Dr. Elfant might have testified without
violating the PFA, should have been presented to the trial court
at the appropriate time - during the argument of the in limine
motion. We will not consider those arguments on appeal, because
they were not presented to the trial court. See Nieder v. Royal
Indem. Ins. Co., 62 N.J. 229, 234 (1973).

 22 A-1642-15T2
arguments are without sufficient merit to warrant discussion

beyond these brief comments. R. 2:11-3(e)(1)(E).

 The evidence was primarily presented to support the informed

consent claim. Plaintiff asserted that defendant misrepresented

to the patient that he had prior experience in performing the

surgery when, according to plaintiff, he had no such experience.

See Howard v. Univ. of Med. & Dentistry of N.J., 172 N.J. 537,

555-57 (2002). Because the jury returned a no-cause verdict on

the informed consent claim, any errors in admitting evidence on

that issue would have been harmless. R. 2:10-2.

 Evidence that defendant had never performed this surgery

before was also relevant to whether he might, for that reason,

have been unfamiliar with the proper way to deal with an esophageal

puncture, which was a known but uncommon risk of the surgery.

Thus, it was pertinent to the malpractice claim. It was up to the

jury to decide what weight, if any, to give that evidence.

 Affirmed.

 23 A-1642-15T2