FILED
11/17/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 3, 2020 Session

## DONNA COOPER ET AL. v. DR. MASON WESLEY MANDY ET AL.

**Appeal from the Circuit Court for Williamson County**
**No. 2018-191      James G. Martin, III, Judge**

---

### No. M2019-01748-COA-R9-CV

---

The principal issue in this interlocutory appeal is whether intentional misrepresentations made by health care providers to induce a prospective patient to engage the health care providers' services are within the purview of the Tennessee Health Care Liability Act ("the Act"), Tenn. Code Ann. § 29-26-101 to -122. The complaint filed by the patient, Donna Cooper ("Mrs. Cooper"), and her husband alleges that Dr. Mason Wesley Mandy ("Dr. Mandy") and Rachelle Norris ("Ms. Norris") with NuBody Concepts, LLC, intentionally misrepresented that Dr. Mandy was a board-certified plastic surgeon and, based on their misrepresentation, Mrs. Cooper gave Dr. Mandy her consent to perform the surgery. Following "painful, disastrous results," the plaintiffs asserted four claims: (1) intentional misrepresentation; (2) medical battery; (3) civil conspiracy; and (4) loss of consortium. Defendants filed a Tenn. R. Civ. P. 12 motion to dismiss for failure to comply with the pre-suit notice and filing requirements of the Act, specifically Tenn. Code Ann. §§ 29-26-121 and -122. The trial court denied the motion to dismiss, finding the Act did not apply. This interlocutory appeal followed. We hold that Mrs. Cooper is entitled to proceed on her claims of intentional misrepresentation and civil conspiracy because the alleged misrepresentations were inducements made prior to the existence of a patient-physician relationship; thus, the claims were not related to "the provision of . . . health care services." *See* Tenn. Code Ann. § 29-26-101(a)(1). We also affirm its ruling on the medical battery claim because a physician's misrepresentation of a material fact, if proven, may vitiate consent, and, without consent, the very act of touching Mrs. Cooper may constitute an unlawful and offensive act that is not related to the provision of health care services. *See Holt v. Alexander*, No. W2003-02541-COA-R3-CV, 2005 WL 94370, at *6 (Tenn. Ct. App. Jan. 13, 2005). Further, we affirm the trial court's ruling on Mr. Cooper's claim for loss of consortium because, as the trial court held, his claims relate to Dr. Mandy's and Ms. Norris's false representations of Dr. Mandy's credentials, not to a provision of, or a failure to provide, a health care service. Accordingly, we affirm the trial court in all respects and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court**

**Affirmed and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT J. joined. RICHARD H. DINKINS, J., not participating.

J. Eric Miles and Matthew Buchbinder, Nashville, Tennessee, for the appellants, Mason Wesley Mandy, M.D., and Middle Tennessee Surgical Services, PLLC.

R. Dale Bay, Paul Jordan Scott, and Kaycee L. Weeter, Nashville, Tennessee, for the appellant, NuBody Concepts, LLC.

G. Kline Preston, IV, Nashville, Tennessee, for the appellees, Donna Cooper and Michael Cooper.

**OPINION**

Mrs. Cooper and her husband, Michael Cooper ("Mr. Cooper"), (collectively, "Plaintiffs") filed two complaints against Dr. Mandy, Nubody Concepts, LLC, ("NuBody"), and Middle Tennessee Surgical Services, PLLC, ("MTSS")[1] (collectively, "Defendants"). Plaintiffs voluntarily dismissed the first complaint, filed on September 30, 2015, after Defendants filed Tenn. R. Civ. P. 12 motions to dismiss for failure to comply with the pre-suit notice and filing requirements of the Act. *See* Tenn. Code Ann. § 29-26-121 and -122. Plaintiffs commenced this action by timely filing their second complaint on April 18, 2018, which was substantially similar to the first. Because this appeal arises from a decision on a Rule 12.02 and 12.03 motion to dismiss, we derive the facts from the second complaint, which was the pleading at issue in this appeal.

Acting upon advertising and marketing information disseminated by NuBody, Mrs. Cooper visited the offices of NuBody in Brentwood, Tennessee on September 17, 2014, where she met with a NuBody representative and Dr. Mandy to discuss possible breast reduction surgery.[2] Mrs. Cooper alleges that Dr. Mandy and Ms. Norris, a Nubody employee, told her Dr. Mandy was a board-certified plastic surgeon with years of experience in performing breast reduction surgeries. Mrs. Cooper further alleges that she relied on these representations when entering into the agreement on September 19, 2014, to have Dr. Mandy perform her breast reduction surgery. Shortly thereafter, Mrs. Cooper

---

[1] The complaint alleges that Dr. Mandy was "an employee or agent" of Nubody and "an owner and employee of Defendant, Middle Tennessee Surgical Services, LLC," at all times material to this action.

[2] The complaint alleges that Nubody is a Nevada Limited Lability Company which "advertises it provides cosmetic surgical procedures via television, internet, social media and print media. It advertised and represented that Defendant, Dr. Mandy, was a board-certified general surgeon."

remitted the agreed-upon fee of $4,000. Dr. Mandy performed the surgery on October 2, 2014, at MTSS.

The complaint alleges the procedure was "unnecessarily painful, that it was done in a barbaric fashion in unsterile conditions and that it has left her disfigured and with grotesque and painful bacterial infections."[3] It states:

> Defendants falsely represented that Defendant Dr. Wesley Mandy, was a board-certified plastic surgeon with years of experience who was experienced in performing the breast reduction procedure she had agreed to permit him to perform prior to entering into the agreement and prior to consenting to have the procedure. In fact, Dr. Mandy was not board-certified in any field at the time.

The complaint alleges it was not until after her surgery that Mrs. Cooper discovered Dr. Mandy had never been board certified in any field, and "had she known that Defendant, Dr. Wesley Mandy, was not a board-certified plastic surgeon she would not have consented to the breast reduction surgery." If not for Defendants' false representations, Mrs. Cooper claims she never would have entered into the contract for Dr. Mandy to perform the surgery.

Plaintiffs asserted claims for (1) intentional misrepresentation, (2) medical battery, (3) civil conspiracy, and (4) loss of consortium. Plaintiffs sought compensatory damages for each Plaintiff in an amount in excess of $500,000 as well as punitive damages in an amount in excess of $1,000,000. With regard to the medical battery claim, the complaint stated: "Defendants performed a surgical procedure on her without her effective consent which constitutes a medical battery." As for the civil conspiracy claim, the complaint stated: "Defendants worked together in concert through fraud and misrepresentation to jointly profit from the breast reduction procedure performed on Plaintiff, Donna Cooper."

Dr. Mandy and MTSS responded to the complaint by filing a joint motion to dismiss arguing that Plaintiffs failed to substantially comply with the following requirements of the Act: (1) provide a HIPPA-compliant medical records authorization with their pre-suit notice letter; (2) demonstrate compliance with Tenn. Code Ann. § 29-26-121 by including a statement in the complaint that Plaintiffs complied with Tenn. Code Ann. § 29-26-121(a); (3) attach a copy of the notice letter to the complaint; (4) file a certificate of mailing and affidavit as required; and (5) file a certificate of good faith with the complaint. Dr. Mandy and MTSS argued that the facts alleged in the complaint qualified as a health care liability action, and, as such, the court should dismiss Plaintiffs' claims in their entirety for failure

---

[3] Plaintiffs seek to recover damages for permanent physical disfigurement, pain and suffering, loss of enjoyment of life, lost income, and strain on the marriage.

to comply with the Act. Additionally, they argued Plaintiffs could not escape the requirements of the Act by framing their suit as claims for intentional misrepresentation, medical battery, civil conspiracy, and loss of consortium. Dr. Mandy and MTSS argued that the theory under which a plaintiff pursues a claim does not matter. This is because Tenn. Code Ann. § 29-26-101(a)(1) provides that, if a claim relates to a health care provider providing health care services, it is a health care liability claim "regardless of the theory of liability on which the action is based."

In addition to relying on the Act, Defendants argued that Plaintiffs' claims should be dismissed pursuant to Tennessee Rules of Civil Procedure 12.02 and 12.03 for failure to state a claim upon which relief can be granted. Specifically, Defendants contended that (1) Plaintiffs' medical battery claim must be dismissed because Mrs. Cooper consented to the breast reduction procedure, (2) fraud resulting in physical injury does not exist as a cause of action in Tennessee, and (3) there are no valid parent claims upon which to pursue Plaintiffs' derivative claims of civil conspiracy or loss of consortium. In sum, Defendants' motion to dismiss asked the trial court to determine whether Dr. Mandy's actions were related to "the provision of, or failure to provide, health care services." Tenn. Code Ann. § 29-26-101(a)(1).

In addressing the motion to dismiss, the trial court noted that the Act defined a health care liability action as "[1] any civil action . . . alleging that [2] a health care provider or providers [3] have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability on which the action is based." Tenn. Code Ann. § 29-26-101(a)(1). The court found that the intentional misrepresentations made by Defendants did not fall within the definition of "care" as provided by Tenn. Code Ann. § 29-26-101(b). Relying on *Lacy v. Mitchell*, the trial court concluded that the Act was not designed to protect a health care provider when he or she misrepresented his or her credentials. 541 S.W.3d 55 (Tenn. Ct. App. 2016).

Specifically, the trial court said:

Similar to *Mitchell*, the Coopers' intentional misrepresentation claim occurred outside of Dr. Mandy's care of Ms. Cooper. In *Mitchell*, the allegation of slapping the Appellant with a folder occurred after a health care service had been rendered. Here, the misrepresentation occurred before the health care service was provided. Reasoning by analogy, the Court has considered another factual scenario. For example, would the Act apply if Dr. Mandy was not a health care provider and instead pretended to be a physician? The answer is "no." The Act's intended purpose was to insulate health care providers when there is a claim of injury related to the provision of, or failure to provide, health care services to a person. Tenn. Code Ann. § 29-26-101. The Act was not intended to protect those persons, pretending to be a health care provider, from liability. A similar scenario is presented here. The Act was not designed to protect a health care provider when he or she

misrepresents his or her credentials. The Court finds that Dr. Mandy's and Ms. Norris's representations are not related to a provision of, or a failure to provide, a health care service.

Focusing its analysis on "whether a misrepresentation regarding a health care provider's credentials constitutes a health care service," the trial court held that "intentionally misrepresenting one's medical credentials does not fall within the purview of the Act." The trial court found "Ms. Cooper was not within Dr. Mandy's 'care'" before signing the contract, and "Ms. Cooper was not bound to Dr. Mandy's services until after she signed the contract." As such, the trial court determined the Act did not apply to this claim.

Regarding the claim of medical battery, the trial court found the claim arose out of Mrs. Cooper's contractual authorization of the surgical procedure. The court explained, "The gravamen of a medical battery claim is that the misrepresentations negated Ms. Cooper's authorization of the procedure."[4] Accordingly, the court held that the Act did not apply because the allegation did not relate to the provision of, or the failure to provide, a health care service.

The trial court also found that Plaintiffs' claims of civil conspiracy and loss of consortium related to Defendants' intentional misrepresentations of Dr. Mandy's board certification credentials, not to the "care" or "the provision of . . . health care services" as contemplated under the Act. As such, the court held Plaintiffs were excused from complying with the Act's pre-suit notice requirements in regard to their derivative claims. The trial court explained:

> The Coopers allege that all of the defendants "worked together in concert through fraud and misrepresentation to jointly profit from the breast reduction procedure..." The Coopers also allege that Mr. Cooper has "suffered a loss of consortium with his wife as a direct and proximate result of Defendants' unlawful fraud and deceit." The Court finds that the Coopers' derivative claims of civil conspiracy and loss of consortium relate to Dr. Mandy's and Ms. Norris's misrepresentations of Dr. Mandy's credentials. The claims do not relate to a provision of, or a failure to provide, a health care service. The Coopers are excused from complying with the Act's pre-suit notice requirements in regards to their derivative claims. Dr. Mandy and

---

[4] We note that the language used by the trial court "on the gravamen of the complaint standard," was rejected in *Estate of French v. Stratford House*, 333 S.W.3d 546, 565 (Tenn. 2011). As has been explained by our Supreme Court, the "'nuanced' approach for distinguishing ordinary negligence and health care liability claims as outlined in *Estate of French* has been statutorily abrogated" by the Tennessee Civil Justice Act of 2011. *Ellithorp v. Weismark*, 479 S.W.3d 818, 827 (Tenn. 2015).

MTSS's Motion to Dismiss the Coopers' derivative claims for failing to comply with the Act's procedural requirements is denied.

After the trial court found the Act did not apply to Plaintiffs' claims and the complaint stated claims for which relief could be granted, Dr. Mandy and MTSS moved to alter or amend the judgment and, in the alternative, to grant an interlocutory appeal. Additionally, NuBody moved for judgment on the pleadings, joining in the other defendants' arguments and asserting similar arguments for dismissal. NuBody also joined in the motion for interlocutory appeal. The trial court denied Dr. Mandy and MTSS's motion to alter or amend and NuBody's motion for judgment on the pleadings but granted Defendants' motion to seek an interlocutory appeal. The trial court based its decision to grant an interlocutory appeal, in pertinent part, on the following:

> This Court specifically finds that interlocutory review is necessary to ensure the development of a uniform body of law, because there is a lack of directly analogous appellate caselaw supporting the Court's ruling that Plaintiff's claims are not subject to the Health Care Liability Act. Specifically, there is no Tennessee case specifically addressing whether a claim for injuries arising from a surgical procedure to which a plaintiff consents, which is based on a claim that the defendant healthcare providers misrepresented the surgeon's credentials prior to said surgical procedure, is governed by the Health Care Liability Act and, therefore, subject to the pre-suit notice requirements set forth under Tenn. Code Ann. § 29-26-121 and the certificate of good faith requirements set forth under Tenn. Code Ann. § 29-26-122. The Tennessee Supreme Court in *Ellithorpe v. Weismark*, 479 S.W.3d 818 (Tenn. 2015), in construing Tenn. Code Ann. § 29-26-101 held "all civil actions alleging that a covered health care provider or providers have caused an injury related to the provision of, or failure to provide health care services be subject to the pre-suit notice and certificate of good faith requirements, regardless of any other claims, causes of action, or theories of liability alleged in the complaint." *Id*. at 827. However, it is unclear pursuant to the plain language of the statute whether a physician's misrepresentations to a patient about his credentials prior to a surgical procedure relate to the provision of health care services.

The court also found that an interlocutory appeal was necessary to prevent needless, expensive, and protracted litigation. We agreed that an interlocutory appeal was appropriate so that this court could review the trial court's ruling that Plaintiffs' claims were not subject to the Act.

**STANDARD OF REVIEW**

- 6 -

Following the grant of an application for interlocutory appeal, "the standard of review is the same standard that would have been applied to the issue(s) in an appeal as of right." *Peck v. Tanner*, 181 S.W.3d 262, 265 (Tenn. 2005). The "proper way" for a defendant to challenge a plaintiff's noncompliance with the procedural requirements of the Act is by a motion to dismiss. *Myers v. AMISUB (SFH), Inc.,* 382 S.W.3d 300, 307 (Tenn. 2012). A trial court's denial of a motion to dismiss is a question of law, which this court reviews de novo with no presumption of correctness. *See Cannon ex rel. Good v. Reddy*, 428 S.W.3d 795, 798–99 (Tenn. 2014); *see also Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 851 (Tenn. 2010). Upon appeal of such an order, "we take all allegations of fact in the plaintiff's complaint as true and review the lower courts' legal conclusions de novo with no presumption of correctness." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997).

This appeal also involves the interpretation of state statutes. As our Supreme Court explained,

> [s]tatutory construction is a question of law that is reviewable on a de novo basis without any presumption of correctness. When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. When a statute is clear, we apply the plain meaning without complicating the task. Our obligation is simply to enforce the written language. It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed.

*In re Estate of Tanner*, 295 S.W.3d 610, 613–14 (Tenn. 2009) (other internal citations omitted).

## ANALYSIS

Dr. Mandy and MTTS state their issue as follows:

Is Plaintiffs' cause of action to recover damages for alleged injuries resulting from a surgery performed by a licensed medical doctor, to which Plaintiff admittedly consented, subject to the Health Care Liability Act's pre-suit notice and certificate of good faith requirements set forth under Tenn. Code Ann. §§ 29-26-121 and -122 and, thus, due to be dismissed with prejudice?

NuBody states its singular issue as follows: "Does the Tennessee Health Care Liability Act govern a civil action that alleges injury related to a surgical procedure performed by a physician without effective consent?"

Plaintiffs did not set forth a specific issue but contend their claims are not subject to the Act.

## I. APPLICABILITY OF THE ACT

"A claim will be subject to the [Act] if the facts of the case show that it qualifies as a 'health care liability action' as that term is statutorily defined." *Osunde v. Delta Med. Ctr.,* 505 S.W.3d 875, 884 (Tenn. Ct. App. 2016). The Act defines a health care liability action as any civil action alleging that "a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability on which the action is based." Tenn. Code Ann. § 29-26-101(a)(1). The Act defines "[h]ealth care services" as, among other things, "care by health care providers," including physicians, and "staffing, custodial or basic care, positioning, hydration and similar patient services." *Id*. § 29-26-101(b).

This court explained the approach for application of the Act in *Lacy v. Vanderbilt Univ. Med, Ctr*., No. M2016-02014-COA-R3-CV, 2017 WL 6273316, at *6 (Tenn. Ct. App. May 4, 2017):

> In *Ellithorpe v. Weismark*, 479 S.W.3d 818 (Tenn. 2015), the Tennessee Supreme Court clarified what effect the new statutory definition of "health care liability action" would have on prior case law. In *Ellithorpe*, the plaintiffs filed a lawsuit against a licensed clinical social worker for negligence and intentional infliction of emotional distress. 479 S.W.3d at 820. They alleged that the social worker provided counseling services to their minor child without their consent. *Id*. According to their complaint, the plaintiffs' child had been in the temporary custody of her great aunt and uncle pursuant to a juvenile court order that gave plaintiffs the right to be kept informed of, and participate in, the child's counseling. *Id*. at 821. The complaint alleged that the social worker refused to provide the plaintiffs with the child's counseling records and that both the plaintiffs and the child suffered emotional harm as a result of the "secret" counseling. *Id*. at 822. Relying on the statutory definition of a health care liability action, the social

worker filed a motion to dismiss based on the plaintiffs' failure to comply with the THCLA's procedural requirements. *Id*. Relying on *Estate of French*, the plaintiffs argued that their claims sounded in ordinary negligence and were therefore not governed by the THCLA. *Id*. The trial court sided with the social worker and dismissed the plaintiffs' complaint, holding that their claims fit under the THCLA's "very broad" definition of a health care liability action. *Id*. at 823. The Court of Appeals reversed the trial court, concluding that the trial court erroneously "relied on the gravamen of the complaint standard rejected in *Estate of French*." *Id*. The Tennessee Supreme Court then granted an appeal to address "whether the trial court erred by failing to apply this Court's analysis in *Estate of French*[.]" *Id*. at 820. The Supreme Court held "that the 'nuanced' approach for distinguishing ordinary negligence and health care liability claims as outlined in *Estate of French* has been statutorily abrogated" by the Tennessee Civil Justice Act of 2011. *Id*. at 827. It explained that the THCLA "establishes a clear legislative intent that all civil actions alleging that a covered health care provider ... caused an injury related to the provision of or failure to provide health care services" must be initiated in compliance with its procedural requirements "regardless of any other claims, causes of action, or theories of liability alleged in the complaint." *Id*. The Supreme Court concluded that the social worker was a health care provider and that the injuries she allegedly caused were related to the provision of health care services. *Id*. at 827–28. Accordingly, it held that the THCLA applied to the plaintiffs' claims and the trial court's dismissal of their complaint was appropriate. *Id*. at 828.

While *Ellithorpe* clarified that it was no longer necessary to make nuanced distinctions between ordinary negligence and health care liability claims to determine the Act's applicability, "it did not suggest that the [Act] should govern all claims that arise in a medical setting." *Lacy*, 2017 WL 6273316, at *6. As this court explained,

[i]n its natural and ordinary usage, the phrase "related to" simply means connected to in some way. *See* Black's Law Dictionary 1479 (10th ed. 2014) (defining "related" as "[c]onnected in some way"); *see also* Webster's New Collegiate Dictionary 994 (9th ed. 1989) (defining "related" as "connected by reason of an established or discoverable relation"). In that sense, any injury caused by a health care provider in a medical setting can be fairly described as related to the provision of health care services. For example, an injury caused by a doctor running over a person in a hospital parking lot as he or she leaves work would be related to the provision of health care services "in some way" because the doctor's very presence at the hospital was for the purpose of providing health care services. Using such a broad interpretation of the phrase "related to," the THCLA would apply to the injured person's claims against the doctor even if the person had no business at the hospital

and was merely passing through its parking lot. No reasonable person would suggest that the legislature intended the THCLA to impose additional requirements on the plaintiff in such a case. Such a broad interpretation of the statute would be absurd, and "[c]ourts must presume that the Legislature did not intend an absurdity[.]" *See Fletcher v. State*, 951 S.W.2d 378, 382 (Tenn. 1997). In any event, this Court rejected such a broad interpretation of "related to" in *Cordell* when it held that the alleged rape of a hospital patient in her hospital bed by hospital employees was not related to the provision of health care services. *See Cordell*, 2017 WL 830434, at *6.

*Id*. It is undisputed that Defendants are "health care providers" within the meaning of the statute. Thus, our inquiry focuses on whether the injuries alleged in the complaint, and any reasonable inferences therefrom, "relate[] to the provision of, or failure to provide, health care services." Tenn. Code Ann. § 29-26-101(a)(1).

Defendants' position is that Mrs. Cooper alleges she was injured following a surgical procedure by a health care provider; thus, the crux of Plaintiffs' injuries relates to the provision of "health care services." Specifically, Defendants argue that Plaintiffs cannot frame a health care liability action under the cloak of a different name and escape the requirements of the Act because the civil action need only allege an injury related to the provision of health care services for the Act to apply. *See* Tenn. Code Ann. § 29-26-101(a)(1). Defendants maintain that each of Plaintiffs' claims allege injuries related to the provision of health care services, and the trial court erred by refusing to dismiss Plaintiffs' suit in its entirety.

Plaintiffs counter by focusing on the deceptive business practice as the alleged injury, claiming Defendants' intentional misrepresentations vitiated Mrs. Cooper's medical consent to the surgical procedure and arguing that such an action is properly defined as a deceptive business practice rather than a health care liability action. *See Franks. v. Sykes*, 600 S.W.3d 908, 914 (Tenn. 2020).

We have determined that the focus of our analysis of each claim should be consistent with that in *Franks*, which distinguished a healthcare provider's business practices from the provision of health care services.[5] *Id*. Specifically, the Supreme Court reasoned:

[W]e must determine whether the health care provider was acting in a business or in a professional capacity. Under this analysis, when a plaintiff

---

[5] In *Franks*, the plaintiffs sued the hospital after the hospital filed liens for the undiscounted hospital bill. *Id*. at 909.  The plaintiffs sued under the Tennessee Consumer Protection Act, and the trial court dismissed the case holding the act did not apply to a claim where the underlying transaction involved medical treatment. *Id*. The Supreme Court held that the plaintiffs may state a claim under the Tennessee Consumer Protection Act against a hospital for conduct arising out of the hospital's business practice. *Id*.

- 10 -

alleges an injury caused by a health care provider's business practices—including, but not limited to, deceptive practices in advertising, billing, or collections—the plaintiff may state a claim under the [Tennessee Consumer Protection Act ("the Act")]. When a plaintiff asserts a claim that an injury is caused by a health care provider's professional conduct, such as a deviation from the applicable standard of medical care, then the Act does not apply because that claim would be based on medical negligence under the Tennessee Health Care Liability Act. As the *Proctor* court noted, "[t]hese two types of claims are wholly separate and distinct claims governed by separate statutory schemes," 270 S.W.3d at 60, and a health care provider cannot be held liable under both the Act and the Tennessee Health Care Liability Act for the same conduct. *See id.* at 60 (plaintiffs' claims were covered under the Act because they had not alleged that the surgeon deviated from the standard of care, which would have been a claim for medical malpractice, but had alleged improper business practices—misrepresentation to keep their business and improperly charging for a more expensive procedure); *Roberson*, 494 F. Supp. 2d at 869 (holding that inducing a patient to buy a medical device the patient did not need related to the defendant's business practices and not to the medical services that he provided); *see also Henderson*, 623 S.E.2d at 468 (quoting *Haynes*, 699 A.2d at 973) (stating that the "touchstone" of a claim against a health care provider is an allegation based on the entrepreneurial or business aspects of the medical practice "aside from medical competence ... or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel"); *Barnett*, 233 S.W.3d at 730–31 (stating that consumer protection statute did not apply to claims for treatment falling below the standard of care because these claims did not relate to the business aspects of medical practice such as advertising and billing for services); *Darviris*, 812 N.E.2d at 1193–94 (acknowledging that not "all conduct of medical care providers [was] beyond the reach of [the consumer protection] statute," but holding that for the plaintiff to state a claim under that statute, she had to show that the physician's decision to perform a different procedure than planned was solely for financial gain); *Nelson*, 564 N.W.2d at 486–87 (concluding that the defendant's alleged failure to disclose to the patient the kind of sutures that would be used in a procedure or the risks involved with the sutures and misrepresenting to the patient after the procedure that there was no problem with the sutures was a claim based on the provision of medical services and not a claim subject to the consumer protection statute.

*Id.* at 914–15.

Therefore, we will analyze each claim separately to determine whether it alleges the health care provider was acting in a business or in a professional capacity.

- 11 -

## A. Intentional Misrepresentation

We begin our analysis with a simple premise. Generally stated, an intentional misrepresentation in a business setting, the purpose of which is to induce someone to enter into a contractual agreement for professional services, is easily distinguished from the rendering of healthcare services.

The trial court found that intentionally misrepresenting one's medical credentials did not constitute a health care service under the facts of this case. In reaching this conclusion, the trial court noted that neither party was able to cite a reported or unreported case on point, so the court looked to the doctrine of *ejusdem generis* ("of the same kind of class"). "*Ejusdem generis* is an illustration of the broader maxim of *noscitur a sociss* [it is known by its associates]." *Sallee v. Barrett*, 171 S.W.3d 822, 829 (Tenn. 2005). This doctrine of statutory construction provides that "where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated." *Id.* (quoting Black's Law Dictionary 517 (6th ed. 1990)). Applying this doctrine, the trial court found the alleged intentional misrepresentations did not fall within the definition of "care" as provided in the Act. However, no Tennessee court has found the definition of "health care services" to be ambiguous, so reliance on *ejusdum generis* to interpret Tenn. Code Ann. § 29-26-101 is improper. *Id.* at 828 (The doctrine applies when the meaning is ambiguous.); *see, e.g., Ellithorpe,* 479 S.W.3d at 827; *Osunde*, 505 S.W.3d at 884–85.

The trial court also relied on *Lacy v. Mitchell* to determine the Act did not apply to Plaintiffs' claims for intentional misrepresentation.[6] In *Lacy*, this court analyzed the Act's applicability to two claims and found that the Act applied to one claim, but not to the other. 541 S.W.3d at 57. In that case, the plaintiff filed a lawsuit against her chiropractor to recover for injuries she allegedly sustained during a chiropractic appointment. *Id.* The complaint alleged the chiropractor injured the plaintiff when he (1) jumped on her back while she was lying on his chiropractic table and (2) struck her on the back with a medical

---

[6] The plaintiff in that action, Deborah Lacy, filed numerous actions in which she alleged she was assaulted in various settings. Because most of Ms. Lacy's cases were dismissed pursuant to Tenn. R. Civ. P. 12.02(6), this court had to consider the facts alleged in her complaints as true. *See Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). In *Lacy*, 2019 WL 1450390, at *1, Ms. Lacy alleged that several healthcare providers "beat her during the course of her admission to the emergency room." In *Lacy v. Saint Thomas Hospital West*, No. M2016-01272-COA-R3-CV, 2017 WL 1827021 (Tenn. Ct. App. May 4, 2017), Ms. Lacy "brought a pro se action against several medical providers for injuries sustained when she was allegedly beaten during medical procedures." In *Lacy v. Vanderbilt Univ. Med. Ctr.*, No. M2016-02014-COA-R3-CV, 2017 WL 6273316 (Tenn. Ct. App. May 4, 2017), Ms. Lacy sued the hospital and members of its medical staff "for injuries sustained when she was allegedly beaten and misdiagnosed while receiving medical treatment." In *Lacy v. Meharry Gen. Hosp.*, No. M2016-01477-COA-R3-CV, 2017 WL 6501915, at *1 (Tenn. Ct. App. Dec. 19, 2017), Ms. Lacy "sued a physician, alleging that the physician's handshake caused her injuries."

folder as he walked out of the room. *Id*. at 57–58. The trial court dismissed the complaint for the plaintiff's failure to comply with the requirements of the Act. *Id*. at 58. On appeal, this court analyzed the complaint as alleging two distinct injuries caused by two separate, wrongful acts and reviewed each as a separate claim. *Id*. at 57. Based on the complaint's wording, we determined that the first claim arose from an injury the plaintiff allegedly suffered while lying on a chiropractic table during an appointment when a chiropractor applied force to her back by jumping on it. *Id.* at 60. We concluded that the Act governed the first claim and affirmed its dismissal. *Id*. at 61. The second claim alleged the chiropractor caused an injury when he hit the plaintiff on the back with a medical folder after finishing treatment as he was leaving the room. *Id*. After construing the complaint liberally, presuming the allegations to be true, and allowing the plaintiff the benefit of all reasonable inferences, we concluded it was not clear whether the second claim was related to the provision of chiropractic services and held the Act did not apply. *Id.*

In this case, the trial court concluded that, similar to *Lacy*, Plaintiffs' claim for intentional misrepresentation related to an injury that occurred outside the provision of health care services. Specifically, the trial court found it notable that the injury at issue, the misrepresentation, occurred before health care services were rendered. Relying on *Lacy*, the trial court ultimately concluded, "The Act was not designed to protect a health care provider when he or she misrepresents his or her credentials." We agree.

On appeal, Plaintiffs contend the trial court properly reasoned that the intentional misrepresentation and false advertisement occurred prior to the establishment of a physician-patient relationship. Plaintiffs allege that Defendants succeeded in making false representations regarding Dr. Mandy's status as a board-certified plastic surgeon to induce Mrs. Cooper into contracting for the surgery. Mrs. Cooper contends that, had she known Dr. Mandy was not and had never been a board-certified plastic surgeon, she would not have consented to the surgery.

Although Plaintiffs allege that Defendants misrepresented Dr. Mandy's qualifications, Defendants argue that Plaintiffs' claim falls within the purview of the Act. Defendants contend that the Act applies regardless of the theory of liability on which the action is based. This is because the "nuanced" approach for distinguishing negligence and health care liability claims was statutorily abrogated, and the heart of Plaintiffs' action stemmed from the provision of health care services. *Ellithorpe*, 479 S.W.3d at 827. This contention, however, is only true if Plaintiffs' claims allege that a health care provider or providers "caused an injury related to the provision of, or failure to provide, health care services." Tenn. Code Ann. § 29-26-101(a)(1).

Here, Defendants' argument is unpersuasive because it fails to analyze whether the alleged injury relates to the provision of health care services. In stating their claim for intentional misrepresentation, Plaintiffs allege Defendants inflicted the injury prior to the establishment of the doctor-patient relationship; the injury complained of is the fraud

- 13 -

perpetrated on Plaintiffs, not the alleged, botched surgery. As such, our task is to determine whether an intentional misrepresentation in a business setting, the purpose of which is to induce someone to enter into a contractual agreement for professional services, is distinguishable from the rendering of healthcare services. We hold that it is.

In *Slatery*, this court distinguished the applicability of the Act from the Tennessee Consumer Protection Act with respect to business practice claims. *State ex rel Slatery v. HRC Medical Centers, Inc.*, 603 S.W.3d 1 (Tenn. Ct. App. 2019). As we explained, the legislative framework of the Act does not govern all actions or inactions of a health care provider. *Id*. at 14. More recently, our Supreme Court distinguished a healthcare provider's business practices from the provision of health care services. *Franks*, 600 S.W. 3d at 914.

Here, Plaintiffs' intentional misrepresentation claim relates to NuBody's advertising and marketing representations and Dr. Mandy's and Ms. Norris's oral statements, all of which occurred prior to entering into the agreement for Defendants to render healthcare services. Thus, Defendants made the alleged misrepresentations while acting in a business capacity, not in a professional capacity. *See id.* ("[W]e must determine whether the health care provider was acting in a business or in a professional capacity."). We decline to hold that the Act protects a health care provider when the provider acts in a business capacity, rather than in a professional capacity.

## B. Medical Battery

Plaintiffs allege that the breast reduction surgery "constitute[d] an unlawful, offensive touching," a medical battery, because Defendants obtained Mrs. Cooper's consent by fraud, and the fraud vitiated her consent. Therefore, Plaintiffs submit their claim of medical battery falls outside the scope of the Act. In making this argument, Plaintiffs principally rely on *Holt*, 2005 WL 94370, at *6 (A physician's misrepresentation of a material fact will vitiate consent.). Plaintiffs also rely on the well-settled legal principle that fraud vitiates all contracts ab initio. *Samuel v. King*, 14 S.W.2d 963, 964 (Tenn. 1929).

Defendants contend that Plaintiffs have disguised an informed consent claim as one for medical battery, which is significant because the Act expressly governs informed consent claims. Relying on this distinction, Defendants acknowledge that some jurisdictions hold that fraud can vitiate signed consent in some circumstances. *See, e.g., Burchfield v. Renfree*, No. E2012-01582-COA-R3-CV, 2013 WL 5676268, at *33 (Tenn. Ct. App. Oct. 18, 2013). Other jurisdictions treat misrepresentations related to the physician's qualifications as informed consent claims, not eliminating consent altogether. *See, e.g., Howard v. Univ. of Med. & Dentistry of N.J.,* 800 A.2d 73, 84 (N.J. 2002) (holding claim that misrepresentations of a physician's professional experience induced patient to consent to procedure was an informed consent claim); *Franz v. Ashland Hosp. Corp.,* No. 2009-CA-002269-MR, 2014 WL 813085, at *4 (Ky. Ct. App. Feb. 28, 2014) (holding that a surgeon unlawfully performing a procedure without hospital privileges did

not constitute battery because "a physician's lack of hospital privileges simply has no effect on the patient's otherwise valid consent"). For example, in *Paulos v. Johnson*, the Minnesota Court of Appeals held that a surgeon's misrepresentations that the surgeon was board certified in cosmetic surgery prior to a reconstructive ear and nose surgery presented a "pure informed consent issue." 597 N.W.2d 316, 320 (Minn. Ct. App. 1999). And in *Brzoska v. Olson*, 668 A.2d 1355, 1366 (Del. 1995), the Delaware Supreme Court reasoned that a "patient's consent is not vitiated . . . when the patient is touched in exactly the way he or she consented."

Defendants also rely on *Jenkins v. Marvel*. 4:08-cv-75, 2010 WL 11441966, at *1 (E.D. Tenn. June 30, 2010) (applying Tennessee law). In *Jenkins*, the district court held that the plaintiff stated a claim for lack of informed consent by alleging that a surgeon misrepresented his credentials; to wit, the surgeon claimed that he was board certified even though he was not. *Id.* Further, Defendants contend there was no misrepresentation as to the essential character of the procedure. *See* William L. Prosser, *Law of Torts* § 18 (4ᵗʰ ed. 1971) (A misrepresentation vitiates consent for battery claims only if the misrepresentation extends to the nature of the invasion, that is, "the essential character of the act itself . . . rather than to some collateral matter that merely operates as an inducement."). Defendants argue that misrepresentations of collateral matters—including the credentials of the physician performing the procedure—do not vitiate consent. *See id.*; *see also Howard*, 800 A.2d at 84. Based on the foregoing authorities and reasoning, Defendants urge us to hold that Plaintiffs' claim is not for battery but is a veiled informed consent claim and is resultantly governed by the Act.

The trial court found that, like the intentional misrepresentation claim, Plaintiffs' medical battery claim arose out of Mrs. Cooper's contractual authorization of the surgical procedure. The court explained, "The gravamen of a medical battery claim is that the misrepresentations negated Ms. Cooper's authorization of the procedure." As such, the court held the allegation did not relate to the provision of, or the failure to provide, a health care service. The trial court also found that the Coopers' claims were not related to the doctrine of informed consent:

> "A lack of informed consent claim typically occurs when the patient was aware that the procedure was going to be performed but the patient was unaware of the risk associated with the procedure." *Ashe v. Radiation Oncology Assocs.*, 9 S.W.3d 119, 121 (Tenn. 1999). "The inquiry focuses on whether the doctor provided any or adequate information to allow a patient to formulate an intelligent and informed decision when authorizing or consenting to a procedure." *Blanchard*, 975 S.W.2d at 524. There are no allegations in the Complaint that Ms. Cooper was not informed of the risks associated with breast reduction surgery. The allegations solely relate to the consequences of the misrepresentation of Dr. Mandy's credentials by Dr. Mandy and Ms. Norris.

- 15 -

Following extensive research, we find the reasoning in *Holt* to be instructive. The most relevant facts and legal theories at issue in *Holt* are as follows:

This is a medical battery case. The plaintiff went to the hospital suffering from a kidney stone, and was admitted for observation. The next morning, the plaintiff was told that he was scheduled to undergo a procedure to remove the stone. Soon, the defendant physician came to see the plaintiff and told him that he would be performing an invasive procedure which required significant recovery time. According to the plaintiff, the plaintiff then asked the defendant physician whether his treating urologist had approved of the procedure. The defendant physician responded that he had spoken with the urologist and that the urologist had approved the procedure. The plaintiff then signed a consent form, and the procedure was performed. The plaintiff later learned that the defendant physician had not spoken with his urologist, and that the urologist did not approve the procedure. The plaintiff sued the defendant physician and his medical group for medical battery. The trial court granted summary judgment in favor of the defendants. The plaintiff now appeals. We reverse, finding that a genuine issue of material fact exists as to whether the plaintiff's consent to surgery was vitiated by the defendant physician's alleged misrepresentation of fact.

2005 WL 94370, at *1.

When Mr. Holt elected to pursue only a claim for medical battery, the defendant, Dr. Alexander, insisted that the claim was not one for medical battery. *Id.* at *6. To the contrary, Dr. Alexander insisted Mr. Holt based his claim on "medical malpractice and lack of informed consent, which requires expert testimony regarding the applicable standard of care." *Id.* at *4. In making this argument Dr. Alexander relied on *Blanchard v. Kellum,* 975 S.W.2d 522, 524 (Tenn.1998), wherein our Supreme Court set out a clear distinction between a claim of medical battery and an informed consent claim. The Court said:

**We believe that there is a distinction between: (1) cases in which a doctor performs an unauthorized procedure; and (2) cases in which the procedure is authorized but the patient claims that the doctor failed to inform the patient of any or all the risks inherent in the procedure. Performance of an unauthorized procedure constitutes a medical battery.** A simple inquiry can be used to determine whether a case constitutes a medical battery: (1) was the patient aware that the doctor was going to perform the procedure (i.e., did the patient know that the dentist was going to perform a root canal on a specified tooth or that the doctor was going to perform surgery on the specified knee?); and, if so (2) did the patient authorize performance of the procedure? **A plaintiff's cause of action may be classified as a medical battery only when answers to either of the**

- 16 -

**above questions are in the negative.** If, however, answers to the above questions are affirmative and if the plaintiff is alleging that the doctor failed to inform of any or all risks or aspects associated with a procedure, the patient's cause of action rests on an informed consent theory.

*Id.* (emphasis added).

The Court explained in *Blanchard* that in an informed consent case, expert testimony is necessary because "a court must consider the nature of the medical treatment, extent of the risks involved and the applicable standard of care" to determine whether the information provided to the patient was adequate. *Id.* However, expert testimony is not mandated in a medical battery case because "the primary consideration is whether the patient knew of and authorized a procedure." *Id.*

Similar to Defendants' contentions here, in *Holt*, Dr. Alexander argued that Mr. Holt was asserting a veiled informed consent claim because

> Holt knew that Dr. Alexander was going to perform the stone manipulation procedure on him, and (2) Holt clearly authorized the procedure by signing the consent form. Therefore, Dr. Alexander argues, because both questions of the "simple inquiry" test are answered in the affirmative, this is not a medical battery case. *See id.* In response, Holt concedes that he knew that Dr. Alexander was going to perform the stone manipulation procedure on him, but argues that the signed consent form is a nullity because he was induced into signing it under false pretenses. He claims that, to induce him into signing the consent form, Dr. Alexander told him that he had spoken with Dr. Meriwether and that Dr. Meriwether approved of the procedure.

2005 WL 94370, at *5. Mr. Holt countered insisting his consent was a nullity because Dr. Alexander's false representation that Dr. Meriwether "okayed" the procedure was the reason he signed the consent form. *Id*. "Because Dr. Alexander had in fact not spoken to Dr. Meriwether and Dr. Meriwether had not approved the procedure, Holt argued, his consent was a nullity." *Id*.

The *Holt* court analyzed the parties' opposing arguments, including Dr. Alexander's reliance on the principle that "a signed consent form raises a presumption that the patient has consented to the procedure 'in the absence of proof of misrepresentation, inadequate disclosure, forgery, or lack of capacity.'" *Id*. (quoting *Church v. Perales,* 39 S.W.3d 149, 161 (Tenn. Ct. App. 2000)). After considering the opposing views, the *Holt* court reasoned:

> The signed consent form, however, raises only a presumption of consent to surgery. A claim for medical battery can be established if it is shown that the physician intentionally or recklessly misrepresented a material fact in order

- 17 -

to obtain the patient's signature on the consent form, thus vitiating the patient's consent. For example, in *Petzelt v. Tewes,* 581 S.E.2d 345, 347 (Ga. Ct. App. 2003), the plaintiff consented to a "denervation" procedure to alleviate pain in her back, based on the defendant physician's representation that the patient's orthopedic surgeon was "fully aware" of everything the defendant physician was doing. *Id.* at 346-347. In reality, the defendant physician had dictated notes indicating a "c.c." to the orthopedic surgeon, but had no idea whether the orthopedic surgeon had either received or reviewed the notes. It turned out that the orthopedic surgeon was unaware of the defendant physician's course of treatment of the plaintiff. *Id.* at 347-348. The appellate court found that the jury could conclude from the evidence that the defendant physician had misrepresented to the plaintiff that the orthopedic surgeon had acquiesced to her treatment plan for the plaintiff. *Id.* at 348. Under these circumstances, the plaintiff's consent to the medical procedure "may be vitiated." *Id.* at 347; *see also Duncan v. Scottsdale Med. Imaging, Ltd.,* 70 P.3d 435, 440 (Ariz.2003) (en banc) (holding that although consent to injection was given, consent was obtained by misrepresentation and, thus, was invalid).

*Id*. at *6.

Following a review of the evidence, the court found that "Mr. Holt submitted his own testimony that Dr. Alexander represented to him that he had spoken to Dr. Meriwether before the surgery and that Dr. Meriwether approved of the procedure." However, "Dr. Alexander admit[ted] he did not talk with Dr. Meriwether," and Dr. Meriwether did not order the procedure. *Id*. Based on these facts, the court concluded that "[t]his claim is not one of lack of informed consent, where the physician 'failed to inform [the patient] of any or all risks or aspects associated with a procedure.'" *Id*. (quoting *Blanchard,* 975 S.W.2d at 524). The court further stated:

Under comment h of the Restatement, [Restatement 2d Torts 892B(2) (1979)], a patient adversely affected by the misrepresentation may either bring an action for misrepresentation or "treat the consent as invalid and maintain any tort action open to him in the absence of consent." Where a signed consent form raises the presumption of valid consent, and the plaintiff claims that his consent was vitiated by "misrepresentation, inadequate disclosure, forgery, or lack of capacity," a claim for medical battery is stated and expert testimony is not necessary to prove such a claim. *Church,* 39 S.W.3d at 161.

*Id*.

Accordingly, the *Holt* court concluded that Mr. Holt stated "a claim for medical battery, insofar as his consent to the medical procedure was based on Dr. Alexander's alleged misrepresentation. As such, expert testimony was not required to establish his claim." *Id.* at *7.

For the foregoing reasons, we find Plaintiffs have not asserted an informed consent claim; instead, Plaintiffs have stated a medical battery claim. This, however, is not determinative of whether the Act governs the medical battery claim. As the trial court correctly noted, "[t]he determination of whether a claim falls within the purview of the Act depends on the facts of the case." *See Cordell v. Cleveland Tennessee Hosp., LLC*, 544 S.W.3d 331, 339 (Tenn. Ct. App. 2017) ("Whether a case is subject to the strictures of the Tennessee Health Care Liability Act will invariably depend on the facts of each case and the allegations pled in the complaint."). As such, we will now analyze the medical battery claim to determine whether the injury relates to the provision of or failure to provide health care services. Instructive in that analysis is whether the Defendants acted in a business or in a professional capacity at the time of the alleged injury.

Based upon the foregoing, the trial court reviewed the applicable facts in this case and determined:

> [S]imilar to their intentional misrepresentation claim, the Coopers' medical battery claim arises out of Ms. Cooper's contractual authorization for the surgical procedure. The gravamen of the medical battery claim is that the misrepresentations negated Ms. Cooper's authorization of the procedure. This allegation does not relate to the provision of, or the failure to provide, a health care service.

The trial court concluded that, similar to *Lacy v. Mitchell*, Plaintiffs' claim for intentional misrepresentation related to an injury that occurred outside the provision of health care services. Specifically, the trial court found it notable that the injury at issue, the misrepresentation, occurred before Defendants rendered health care services. Relying on *Lacy*, the trial court ultimately concluded, "The Act was not designed to protect a health care provider when he or she misrepresents his or her credentials." With some distinctions, we agree.

As we explained, the Court rejected this "gravamen of the complaint standard" in *Estate of French*, 333 S.W.3d at 565. As such, this court will consider whether a covered health care provider caused an injury related to the provision of or failure to provide health care services. Tenn. Code Ann. § 29-26-101(a)(1); *see Ellithorpe*, 479 S.W.3d at 827. If so, Plaintiffs were required to comply with the procedural mandates of the Act to proceed on their claim of medical battery.

We find *Lacy v. Mitchell* distinguishable from the present case. In *Lacy,* this court was presented with two claims for medical battery that stemmed from the same visit. 541 S.W.3d at 57. The first claim alleged the medical battery occurred during the provision of health care services; the plaintiff claimed the chiropractor injured her when he jumped on her back while she was lying on the chiropractic table during her appointment. *Id.* at 60. We held that the Act applied to that claim because the chiropractor caused the alleged injury while providing health care services. *Id.* Alternatively, the second claim alleged the chiropractor struck the plaintiff on the back with a medical folder as he walked out of the room. *Id*. at 61. We determined it was not clear whether the second claim related to the provision of chiropractic services and held the Act did not apply. *Id.*

At first glance, it may appear that the first claim alleged in *Lacy* is on point with the facts of the present case; however, it is notable that, in *Lacy*, the plaintiff consented to the provision of chiropractic services prior to chiropractic services being rendered. *Id.* at 57. Thus, the provision of health care services did not initiate a claim for medical battery. Stated another way, the chiropractor in *Lacy* had consent to touch the plaintiff and provide health care services. It was not until he exceeded the scope of that consent, or acted in a manner inconsistent with the treatment approved by the plaintiff, that a cause of action for medical battery arose. *Id*. In stark contrast, because the alleged fraud vitiated Mrs. Cooper's consent, Defendants did not have consent to provide any health care services to Mrs. Cooper. As such, Mrs. Cooper did not give consent for Defendants to act as her health care providers at the time she sustained the alleged injury. Thus, unlike *Lacy*, a cause of action for medical battery arose the moment an unlawful, offensive touching occurred. Because there was no consent from Mrs. Cooper, we are not asked to consider whether, during the provision of health care services, Defendants exceeded the scope of consent or acted in a manner inconsistent with the plaintiff's consent. Instead, the very act of touching Mrs. Cooper, whether for the provision of health care services or for any other reason, resulted in a cause of action for medical battery.

In reviewing each claim, we consider whether Plaintiffs alleged that Defendants were acting in their business or professional capacity at the time of the alleged injury. By fraudulently inducing Mrs. Cooper to contract for the procedure, Defendants were acting in their business capacity, not in their professional capacity. The alleged fraud vitiated Plaintiffs' consent to being touched. As such, Defendants never received authority from Mrs. Cooper to act in their professional capacity. Therefore, the injury alleged does not relate to the provision of health care services by a health care professional.

Unlike the first claim in *Lacy*, this case does not require us to review injuries resulting from health care services because Ms. Cooper never authorized health care services. Accordingly, we affirm the trial court's determination that the medical battery claim does not fall within the purview of the Act.

## C. Civil Conspiracy

Plaintiffs brought a claim for civil conspiracy alleging that Defendants all "worked together in concert through fraud and misrepresentation to jointly profit from the breast reduction procedure…"

"The elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006).

> A claim for civil conspiracy "requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007). Conspiracy, standing alone, is not actionable where the underlying tort is not actionable. *Id*. at 179-80.

*Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010). Therefore, "there is no liability under a theory of civil conspiracy unless there is underlying wrongful conduct." *Levy v. Franks*, 159 S.W.3d 66, 82 (Tenn. Ct. App. 2004).

The trial court found that Plaintiffs' claims of civil conspiracy related to Defendants' misrepresentations of Dr. Mandy's credentials, which did not relate to a provision of, or a failure to provide, a health care service. We agree.

Plaintiffs' claim for civil conspiracy stemmed from the underlying tort of intentional misrepresentation, which, as explained above, did not relate to a provision of a health care service; thus, the claim did not require compliance with the Act for Plaintiffs to proceed to trial.

### D. Loss of Consortium

Defendants correctly point out that loss of consortium is a derivative claim, in that, the injuries to the spouse are an element that must be proved. *Cross v. City of Memphis*, 20 S.W.3d 642, 645 (Tenn. 2000). However, "loss of consortium is a right independent of the spouse's right to recover for the injuries themselves," *Swaffard v. City of Chattanooga*, 743 S.W.2d 174, 178 (Tenn. Ct. App. 1987), as well as a derivative claim, in that, Mr. Cooper's claim originates from Mrs. Cooper's claims for intentional misrepresentation and medical battery. *Hunley v. Silver Furniture Mfg*. Co., 38 S.W.3d 555, 557 (Tenn. 2001).

Plaintiffs allege that Mr. Cooper has suffered because Mrs. Cooper is in constant pain and has been "unable to be the companion to whom he is accustomed…" After ruling that the Act did not govern Mrs. Cooper's claims, the court addressed Mr. Cooper's derivative claim for loss of consortium. The trial court held that Plaintiffs alleged sufficient

facts to recover under a loss of consortium claim. With regard to application of the Act, the trial court explained:

> The Coopers allege that all of the defendants "worked together in concert through fraud and misrepresentation to jointly profit from the breast reduction procedure..." The Coopers also allege that Mr. Cooper has "suffered a loss of consortium with his wife as a direct and proximate result of Defendants' unlawful fraud and deceit." The Court finds that the Coopers' derivative claims of civil conspiracy and loss of consortium relate to Dr. Mandy's and Ms. Norris's misrepresentations of Dr. Mandy's credentials. The claims do not relate to a provision of, or a failure to provide, a health care service. The Coopers are excused from complying with the Act's pre-suit notice requirements in regards to their derivative claims.

For these reasons, the trial court denied Dr. Mandy and MTSS's Motion to Dismiss Mr. Cooper's derivative claim of loss of consortium. We agree and therefore affirm this decision.

## II. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

In addition to the defenses relied upon under the Act, Defendants moved to dismiss all of Plaintiffs' claims under Tennessee Rules of Civil Procedure 12.02 and 12.03 for failure to state a claim upon which relief can be granted; however, only the applicability of the Act is at issue in this interlocutory appeal. Therefore, we have not addressed Defendants' contentions that all of Plaintiffs' claims should be dismissed pursuant to Tenn. R. Civ. P. 12.02 and 12.03 for failure to state a claim upon which relief can be granted.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against Defendants, jointly and severally.

_____
FRANK G. CLEMENT JR., P.J., M.S.